SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-05-0461-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR1995-009046 |
| JAMES CORNELL HARROD, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Ronald S. Reinstein, Judge (Retired)
The Honorable Brian R. Hauser, Judge

**AFFIRMED AS MODIFIED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel,
          Captital Litigation Section
          Robert J. Gorman, Jr.,                          Tucson
          Assistant Attorney General
Attorneys for the State of Arizona

Michael J. Dew                                            Phoenix
Attorney for James Cornell Harrod
_____

**R Y A N**, Justice

¶1      In 2005, a jury determined that James Cornell Harrod should be sentenced to death for the 1988 murder of Jeanne Tovrea.  An automatic notice of appeal was filed under Arizona Rules of Criminal Procedure 26.15 and 31.2(b) and Arizona Revised Statutes ("A.R.S.") section 13-4031 (2001).  We have jurisdiction under Article 6, Section 5(3) of the Arizona

Constitution and A.R.S. § 13-4031.

## I[1]

### A

¶2     Just before 1:00 a.m. on April 1, 1988, Phoenix police officers responded to an alarm company call at a residence.  A kitchen window had been completely removed and was sitting on a chair on the patio; an arcadia door was open.  The police found the owner, Jeanne Tovrea, dead in her bed.  She had been shot five times in the head with a .22 caliber gun - twice through a pillow and three times at close range.  Several drawers from a jewelry case had been removed and set on furniture, and Jeanne's purse had been emptied on the kitchen counter.  The rest of the house appeared undisturbed.

¶3     Jeanne had married Ed Tovrea, Sr., in 1973.  She had an adult daughter from a previous marriage, Debbie Luster.  Ed had three children from a previous marriage, Ed Jr., Georgia, and Priscilla.  When Ed Sr. died in 1983, his estate was worth approximately $8 million.  His will provided that each of his children would receive $200,000, which would be distributed in monthly payments of $1,500.  Jeanne received certain real estate, stock, and personal property listed in the will.  The

---

[1]     We view the facts in the "light most favorable to sustaining the verdict." *State v. Tucker* (*Tucker I*), 205 Ariz. 157, 160 n.1, ¶ 3, 68 P.3d 110, 113 n.1 (2003).  A more detailed account of the facts appears in *State v. Harrod* (*Harrod I*), 200 Ariz. 309, 311-12, ¶¶ 2-11, 26 P.3d 492, 494-95 (2001).

2

remainder of Ed Sr.'s estate was put into a trust. The terms of the trust entitled Jeanne to all the income from the trust during her lifetime, and the trustees were permitted to invade the corpus of the trust for her benefit; upon her death, the trust would pass to Ed Sr.'s three children. At the time of Jeanne's death, the trust had an estimated worth of nearly $4 million.

¶4 Almost a year before her death, Jeanne met with a man in San Diego who called himself Gordon Phillips; he had been contacting her for information regarding Ed Sr.'s involvement in World War II. Jeanne's daughter, Debbie Luster, and Debbie's husband were present at the meeting. Phillips led Debbie to believe he had been a soldier in Vietnam,[2] but he did not seem interested in the World War II related books Debbie and her mother had brought. Debbie became suspicious of Phillips and called security after he left.

¶5 Immediately after Jeanne's death, Debbie told the police about Gordon Phillips. Debbie and her husband also found a micro-cassette tape in Jeanne's home that had several answering machine messages on it, two from Phillips.

¶6 In April 1992, a "re-enactment" of Jeanne's murder was aired on the national television show, *Unsolved Mysteries*.

---

[2] Several of Harrod's friends testified that he had repeatedly told them that he had been in Vietnam. Harrod later admitted lying about his service.

During the segment, one of the telephone messages from Phillips was played. In January 1994, an anonymous caller identified the voice on the tape as James Harrod's.

¶7    In September 1995, the police arrested Harrod for his involvement in the murder of Jeanne Tovrea. At this point, investigators had gathered considerable evidence against Harrod, including bank records showing large money transfers from Ed Tovrea, Jr., to Harrod, telephone records showing calls between Ed Jr. and Harrod, and statements regarding the jewelry and credit cards that were missing. In addition, after being offered immunity, Anne Costello, Harrod's ex-wife,[3] informed police that: (1) Harrod told her that he had been hired by Ed Jr. to coordinate a hit on Jeanne for $100,000; (2) Harrod said that he had posed as Gordon Phillips to interview Jeanne; (3) when Harrod left their house on March 31, 1988, he told Anne he was going to supervise the murder and let her know that it was done when he returned the next morning; (4) Harrod spoke to Ed Jr. on the telephone the morning of April 1, 1988; (5) Harrod and Anne suddenly had large, unaccounted-for sums of money; (6) Harrod received Fed-Ex boxes full of cash from Ed Jr.; and (7) Harrod kept Jeanne's jewelry and credit cards in their house for a time before burying them in the desert. Police also found

---

[3]    Harrod and Anne Costello divorced between the time of the murder and the time she spoke to police.

4

numerous latent fingerprints from Jeanne's kitchen counter, the outside of the window pane, the inside of the window pane, and a gate on her property that matched Harrod's fingerprints.

**B**

¶8        In November 1997, a jury convicted Harrod of premeditated murder and felony murder of Jeanne Tovrea.  A judge subsequently sentenced Harrod to death in May 1998.  This Court affirmed his conviction and death sentence.  *Harrod I*, 200 Ariz. at 320, ¶ 66, 26 P.3d at 503.

¶9        In 2002, the United States Supreme Court, in *Harrod v. Arizona*, 536 U.S. 953 (2002), vacated the judgment and remanded the case for further consideration in light of *Ring v. Arizona* (*Ring II*), 536 U.S. 584 (2002).  This Court subsequently remanded Harrod's death sentence for resentencing in 2003. *State v. Harrod* (*Harrod II*), 204 Ariz. 567, 569, ¶ 11, 65 P.3d 948, 950 (2003).  We noted, however, that "[t]he *Ring II* decision does not affect our original opinion with respect to factual, procedural, and guilt issues, so we need not reconsider those portions of our original opinion."  *Id.* at 568, ¶ 2, 65 P.3d at 949.

¶10        The resentencing proceeding occurred in 2005.  The jury found that the State had proved beyond a reasonable doubt the existence of the (F)(5) "pecuniary value" aggravating factor.  *See* A.R.S. § 13-703(F)(5) (Supp. 1988).  The jury also

5

determined that Harrod should be sentenced to death after finding that the mitigation evidence was not sufficiently substantial to call for leniency. The judge sentenced Harrod to death by lethal injection.

## II

¶11 On appeal, Harrod first claims that the superior court erred by permitting his ex-wife, Anne Costello, to testify to privileged marital communications. We review de novo whether a privilege exists and whether a party has waived it. *Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, 254, ¶ 10, 63 P.3d 282, 285 (2003).

¶12 At Harrod's first trial in 1997, the superior court precluded the State from introducing any communications between Anne and Harrod in its case-in-chief. When Harrod later took the stand and denied having any conversations with Anne regarding the murder of Jeanne Tovrea, the court allowed the State to present Anne's testimony in rebuttal because Harrod had waived the privilege by testifying about those communications. On direct appeal, this Court upheld the superior court's treatment of Anne's testimony. *Harrod I*, 200 Ariz. at 317, ¶ 37, 26 P.3d at 500.

¶13 Before the 2005 resentencing, the superior court ruled that Anne could testify in the aggravation phase because it found the resentencing was a continuation of the guilt phase.

6

*See State v. Ring* (*Ring III*), 204 Ariz. 534, 554 n.19, ¶ 50, 65 P.3d 915, 935 n.19 (2003) ("A capital trial comprises just one trial, divided between guilt and sentencing phases, and has always been understood as such, by both this court and by the U.S. Supreme Court."). In so holding, the superior court relied primarily on the "law of the case" theory.[4] In addition, the superior court ruled that a 1998 amendment to A.R.S. § 13-4062(1) was a procedural change that did not implicate the Ex Post Facto Clauses of the Federal and Arizona Constitutions. U.S. Const. art 1, §§ 9, 10; Ariz. Const. art. 2, § 25.

**¶14** In 1998, the legislature amended the statute codifying the marital communications privilege, A.R.S. § 13-4062(1), to add an exception to the marital privilege when a spouse voluntarily testifies against the other spouse in a prosecution for "an offense listed in section 13-604, subsection [W], paragraph [4]."[5] 1998 Ariz. Sess. Laws, ch. 289, § 19 (2d Reg. Sess.). Section 13-604(W)(4) (Supp. 2007) defines "serious

---

[4] *See, e.g., State v. Richmond*, 180 Ariz. 573, 580 n.8, 886 P.2d 1329, 1336 n.8 (1994) (noting that the law of the case doctrine normally "prevents a court from reconsidering issues of law previously decided"), *abrogated on other grounds*, *State v. Mata*, 185 Ariz. 319, 916 P.2d 1035 (1996).

[5] The subsection letter and number of A.R.S. § 13-604(W)(4) (Supp. 2007) were different at the time of this amendment. Section 13-4062(1) (Supp. 2007) has likewise been amended to correspond. *See* 2005 Ariz. Sess. Laws, ch. 188, § 8 (1st Reg. Sess.); 2004 Ariz. Sess. Laws, ch. 29, § 4 (2d Reg. Sess.); 1999 Ariz. Sess Laws, ch. 261, § 42 (1st Reg. Sess.).

offenses" and includes first degree murder. The amendment to §
13-4062(1) became effective after Harrod's first trial in 1997,
but before his 2005 resentencing. Harrod argues that
application of the amended law to his resentencing violates
A.R.S. § 1-244 (2002) ("No statute is retroactive unless
expressly declared therein.") and the Ex Post Facto Clauses of
the Federal Constitution and the Arizona Constitution. U.S.
Const. art 1, §§ 9, 10; Ariz. Const. art. 2, § 25.

¶15      In *Harrod I*, this Court held that when "a witness
testifies about otherwise privileged marital communications, or
denies having relevant communications with his spouse, he waives
the marital communications privilege with respect to those
communications and may be impeached by his spouse's testimony."
200 Ariz. at 317, ¶ 37, 26 P.3d at 500. Moreover, this Court
has previously held that "once the privilege is waived, the
confidentiality sought to be protected is merely a legal fiction
. . . . [Therefore], once waived, whether at a former trial or
otherwise, [the defendant] cannot reassert his or her
privilege." *State v. Mincey,* 141 Ariz. 425, 439, 687 P.2d 1180,
1194 (1984) (physician-patient privilege); *see also* 1 Joseph M.
Livermore, Robert Bartels & Anne Holt Hameroff, *Arizona
Practice: Law of Evidence* § 501.1, at 124 (4th ed. 2000) ("Once
a privilege has been waived, and confidentiality lost, it may
not be reasserted."); Edward J. Imwinkelried, *The New Wigmore*:

8

Evidentiary Privileges § 6.12.5(c), at 932-33 (2002) (observing that "the prevailing view is that so long as the retrial was not necessitated by an error affecting the privilege waiver, a waiver at the initial trial is still in effect at the retrial").

¶16     Because Harrod waived any objection to his ex-wife's testimony in the 1997 trial, we conclude that Harrod cannot reassert the privilege in this proceeding.  Accordingly, the trial judge did not err in permitting the State to call Costello as a witness.  Our conclusion makes it unnecessary for us to address Harrod's claim that the superior court's reliance on amended A.R.S. § 13-4062(1) at his resentencing violated the Ex Post Facto Clauses of the Federal and Arizona Constitutions.

### III

¶17     Harrod next contends that the superior court erred in allowing Ed Tovrea, Jr., to assert a blanket privilege against self-incrimination to all questions concerning his business operations and payments to Harrod.  Harrod argues that his intended questions would not have incriminated Tovrea and would only establish the legitimacy of the Mineral Exploration Company of the Americas, a company for which Ed Jr. served as President and Harrod allegedly served as a consultant.

¶18     Several months before the resentencing proceeding, the trial judge held a hearing regarding Tovrea's assertion of his Fifth Amendment privilege.  Ed Jr. appeared at the hearing with

9

his attorney. Tovrea's attorney advised the court that he had consulted with his client regarding the questions proffered by Harrod: "This morning I provided [the questions] to Mr. Tovrea. We sat together. We reviewed all of the questions. We reviewed all of the questions together." Tovrea testified that based on consultations with his attorney, he would invoke his Fifth Amendment privilege and refuse to answer any of the questions. He claimed that his answers to the questions would incriminate him. The State confirmed that Ed Jr. remained a target of its investigation into Jeanne Tovrea's murder.

¶19    A trial court's decision whether to allow a party to call a witness before the jury who will assert his Fifth Amendment privilege is reviewed for an abuse of discretion. *State v. Corrales*, 138 Ariz. 583, 588-89, 676 P.2d 615, 620-21 (1983).

¶20    Defendants have a "right to offer the testimony of witnesses, and to compel their attendance, if necessary," in order to present a defense. *Washington v. Texas*, 388 U.S. 14, 19 (1967). This right is guaranteed by the Sixth Amendment and is incorporated in the Due Process Clause of the Fourteenth Amendment. *Id.* at 17-19. But the right is not absolute. *State v. McDaniel*, 136 Ariz. 188, 194, 665 P.2d 70, 76 (1983). "If upon conducting an in camera hearing the trial judge determines that a witness could legitimately refuse to answer essentially

10

all relevant questions, then that witness may be totally excused without violating an individual's Sixth Amendment right to compulsory process." *Id.*

¶21 This exception to a defendant's Sixth Amendment right to call a witness is narrow, however, and applies only "when the trial judge has extensive knowledge of the case and rules that the Fifth Amendment would be properly invoked in response to all relevant questions that the party calling the witness plans on asking." *Id.* For a witness to properly invoke his Fifth Amendment privilege, he must show a "reasonable ground to apprehend danger to [himself] from his being compelled to answer." *State v. Mills*, 196 Ariz. 269, 276, ¶ 31, 995 P.2d 705, 712 (App. 1999) (quoting *United States v. Melchor Moreno*, 536 F.2d 1042, 1046 (5th Cir. 1976)). A trial court does not necessarily have to personally question the witness, conduct a hearing, or allow counsel to call the witness to the stand if the court possesses "extensive knowledge of the case" such that it can find that the witness can legitimately invoke the Fifth Amendment to all relevant questions asked. *Id.; accord State v. Maldonado*, 181 Ariz. 208, 210, 889 P.2d 1, 3 (App. 1994). A judge possesses "extensive knowledge about the case" when the judge has heard, for example, "the state's entire case and a portion of defendant's." *State v. Rosas-Hernandez,* 202 Ariz. 212, 217-18, ¶ 18, 42 P.3d 1177, 1182-83 (App. 2002).

¶22    Here, the trial judge told the parties that he was quite familiar with the State's theory of the case, which implicated Ed Jr. in the murder, because he had presided over Harrod's 1997 trial, sentenced him to death, and presided over hearings leading up to Harrod's resentencing.[6]   Thus, the trial judge clearly had the requisite "extensive knowledge of the case."

¶23    Because he was still a target of the State's investigation, Ed Jr. clearly demonstrated a "reasonable ground to apprehend danger to [himself] from his being compelled to answer."   *Mills*, 196 Ariz. at 276, ¶ 31, 995 P.2d at 712 (citation omitted).   Consequently, we conclude that, under these circumstances, the trial court did not abuse its discretion in excusing Ed Jr. from testifying because he legitimately invoked the Fifth Amendment privilege on the questions proffered by Harrod.

**IV**

¶24    Nearly two years after this Court remanded this matter for resentencing, and approximately one month before the trial date, Harrod's attorneys filed a "Motion for Rule 11 Prescreen[ing] To Determine Competency."   The judge denied the

---

[6]   Judge Ronald Reinstein, who presided over the 1997 trial, was assigned to Harrod's resentencing and ruled on most of the pre-trial motions at issue in this appeal until he was reassigned.

12

motion, observing that the sole basis for the motion was Harrod's lack of cooperation with respect to gathering mitigation evidence, not his alleged incompetence.[7]

¶25        Harrod argues that the trial court lacked discretion to deny his motion, under Arizona Rule of Criminal Procedure 11.2(a), for a pre-screening examination to determine whether he was mentally competent to be resentenced.  He contends that the mandatory language in A.R.S. § 13-703.03(A) (Supp. 2007) and Rule 11.2(a) obligates a trial court to order such an examination in capital cases, even in a resentencing proceeding. The State argues that the motion failed to allege that Harrod was incompetent as defined in Rule 11.1 and that the trial court had discretion whether to order a Rule 11 evaluation in a resentencing proceeding.

¶26        Section 13-703.03(A) requires that "[i]f the state files a notice of intent to seek the death penalty," the trial court must "appoint a psychologist or psychiatrist . . . to conduct a prescreening evaluation to determine if reasonable grounds exist to conduct another examination to determine . . .

---

[7]    In the motion, his attorneys acknowledged that Harrod was "aware of the resentencing process under the current death penalty statute, and . . . aware of the need for mitigation and a thorough mitigation investigation"; however, because the superior court would not permit Harrod to present evidence of residual doubt as mitigation, Harrod declined to cooperate with his attorneys "in gathering the type of information . . . to constitute a thorough mitigation investigation."

13

[t]he defendant's competency to stand trial." In addition, Rule 11.2(a) states that "[i]n a capital case, the court *shall* order the defendant to undergo mental health examinations as required under A.R.S. § . . . 13-703.03."[8] (Emphasis added.)

¶27 The State asserts that A.R.S. § 13-703.03 "only mandates psychological testing in the *pre-trial* phase of capital cases." In this case, the State filed its notice that it would seek the death penalty on October 3, 1995, well before the adoption of A.R.S. § 13-703.03.

¶28 This Court has not yet interpreted the mandatory language of A.R.S. § 13-703.03(A). In interpreting statutes, we begin with the text of the statute. *Mejak v. Granville*, 212 Ariz. 555, 557, ¶ 8, 136 P.3d 874, 876 (2006). If the language is clear and unambiguous, we need look no further. *Id*. Based on the plain language of A.R.S. § 13-703.03(A), the mandatory prescreening evaluation prescribed by the statute arguably applies only to the pre-trial phase of a capital case, after the prosecution has filed its notice to seek the death penalty. Here, that notice was filed approximately six years before the enactment of this statute. It does not appear, therefore, that Harrod was entitled to a mandatory prescreening evaluation under

---

[8] Rule 11.2(a) and A.R.S. § 13-703.02 also require that capital defendants be screened for mental retardation as set forth in A.R.S. § 13-703.02. But Harrod has never claimed he has mental retardation and his Rule 11 motion did not allege he needed to be examined for retardation.

14

either A.R.S. § 13-703.03 or Rule 11.2(a).  For the following reasons, however, we do not have to decide if § 13-703.03 and Rule 11.2(a) apply to capital resentencings.

¶29     Even assuming that A.R.S. § 13-703.03(A) and Rule 11.2(a) mandate a prescreening evaluation in a capital resentencing, any error here is harmless beyond a reasonable doubt.  *See State v. Towery*, 186 Ariz. 168, 185, 920 P.2d 290, 307 (1996) (citing *State v. Bible,* 175 Ariz. 549, 588, 600, 858 P.2d 1152, 1191, 1203 (1993)).  The trial judge was quite familiar with Harrod, having dealt with numerous *pro se* motions that Harrod had previously filed, and having presided over his trial in 1997 and the proceedings leading up to resentencing. He denied Harrod's motion because he found no reasonable cause to believe that Harrod was incompetent.

¶30     Further, Harrod's attorneys conceded that Harrod understood the proceedings and various rulings that the trial judge had made regarding the resentencing.  They also conceded that he understood the importance of and need for mitigation evidence.  Moreover, his attorneys told the court that "Mr. Harrod apparently believes that proof of innocence is the only form of mitigation that will succeed in sparing him from the death penalty."

¶31     As a result of this belief, Harrod refused to permit his attorneys to present certain mitigation evidence;

15

specifically, he refused to allow his family members to testify about his family life and background. On the last day of the penalty phase of the resentencing, Harrod personally confirmed to the trial judge that he was making a reasoned decision not to call family members to testify because they either would be cross-examined or would be limited in presenting residual doubt evidence.

¶32     This Court has held that a defendant was competent when

> the record indicate[d] that [the] defendant was articulate, aware of the proceedings, and knowledgeable about the potential consequences of his choices. On this record, we conclude that defendant was competent when he chose not to cooperate with [the mitigation specialist] and chose to expedite his sentencing proceedings, despite the fact that his decision may have limited the mitigation evidence offered on his behalf.

*State v. Kayer*, 194 Ariz. 423, 436, ¶ 42, 984 P.2d 31, 44 (1999). Therefore, a defendant's choice not to cooperate in presenting mitigation evidence does not give rise to reasonable grounds to grant a competency hearing. *Id*. at ¶¶ 41–42.

¶33     We therefore conclude that even if the trial judge erred in denying the Rule 11 motion for a prescreening examination, nothing in the record suggests that Harrod's decision not to cooperate with defense counsel was anything other than a rational decision. Any error in not ordering an

16

evaluation under A.R.S. § 13-703.03(A) or Rule 11.2(a) was harmless beyond a reasonable doubt.

V

¶34    Harrod next contends that the prosecutor committed misconduct when he argued at the trial in 1997 that Harrod assisted the shooter, and then changed his theory at the resentencing and argued that Harrod actually murdered Jeanne.

¶35    Because Harrod's counsel did not object to the State's resentencing closing argument, the allegation of misconduct is reviewed for fundamental error. *See State v. Roque*, 213 Ariz. 193, 228, ¶ 154, 141 P.3d 368, 403 (2006). Once error has been established,

> [t]o prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. Reversal on the basis of prosecutorial misconduct requires that the conduct be so pronounced and persistent that it permeates the entire atmosphere of the trial.

*State v. Hughes*, 193 Ariz. 72, 79, ¶ 26, 969 P.2d 1184, 1191 (1998) (internal quotation marks and citations omitted). Prosecutors may "argue all reasonable inferences from the evidence," but cannot "make insinuations that are not supported by the evidence." *Id.* at 85, ¶ 59, 969 P.2d at 1197.

¶36    The State's argument that Harrod murdered Jeanne was a reasonable inference drawn from the evidence. Substantial

17

evidence supported the State's theory. Harrod left his house on the evening of March 31, 1988, dressed in camouflage pants, army boots, and an army jacket and carrying a duffel bag. Anne Costello testified that after Harrod left, she checked to see if his weapons, including a .22 caliber pistol with a silencer were in a cabinet drawer; they were not. Harrod's fingerprints were found on both sides of the windowpane and on the kitchen counter, which was the entry point to the home. Although he never admitted to Anne that he was the actual murderer, Harrod did admit that he oversaw the murder and took jewelry and credit cards from Jeanne Tovrea's home and later buried them in the desert. Harrod also admitted that he posed as Gordon Phillips to interview Jeanne and contacted her several times before her death. Telephone records and bank records show a connection between Harrod and Ed Jr. that extended well beyond legitimate business dealings. The prosecutor's argument that Harrod had actually shot and killed Jeanne was a reasonable inference from the evidence. Therefore, the prosecutor did not commit prosecutorial misconduct.

**VI**

¶37    Harrod argues that the superior court erred in refusing to allow him to present residual doubt evidence during the penalty phase of the sentencing proceeding. Specifically, he wanted to present the results of a polygraph examination and

18

make statements of innocence during the penalty phase. Harrod contends that the court's ruling precluding such evidence violated his constitutional right to present all relevant mitigation evidence.[9] He also claims that Arizona law expressly permits residual doubt evidence as a mitigating factor at the penalty phase under A.R.S. § 13-703(G) (Supp. 2007).

¶38 A trial court's ruling on the admission of evidence in the penalty phase is reviewed for an abuse of discretion. *State v. Garza*, 216 Ariz. 56, 68, ¶ 56, 163 P.3d 1006, 1018 (2007), *cert. denied*, ___ S. Ct. ___ (2008). All legal and constitutional questions are reviewed de novo. *State v. McGill*, 213 Ariz. 147, 156, 159, ¶¶ 40, 53, 140 P.3d 930, 939, 942 (2006), *cert. denied*, 127 S. Ct. 1914 (2007).

¶39 In *Oregon v. Guzek*, the United States Supreme Court stated that:

---

[9] In *Harrod I*, this Court examined residual doubt in the context of Harrod's argument concerning the admissibility of a polygraph examination and also in its independent review of the death sentence. All five justices agreed that there was no residual doubt as to Harrod's guilt in the murder of Jeanne Tovrea. *Harrod I,* 200 Ariz. at 317, 319, 320, 322, ¶¶ 39, 55, 67, 77, 26 P.3d at 500, 502, 503, 505. As a result, the majority opinion did not resolve the question of whether residual doubt can ever be used as a mitigating factor. *Id.* at 322, ¶ 77, 26 P.3d at 505 (Feldman, J., specially concurring). Two justices, Justices Feldman and Zlaket, however, believed that "residual doubt is a mitigating circumstance." *Id.* at 323, ¶ 82, 26 P.3d at 506. But as discussed below, the law regarding the admissibility of residual doubt evidence has changed since *Harrod I*.

> . . . [T]he federal question before us is a narrow one. Do the Eighth and Fourteenth Amendments grant Guzek a constitutional right to present evidence of the kind he seeks to introduce, namely *new* evidence that shows he was not present at the scene of the crime. That evidence is *inconsistent* with Guzek's prior conviction. It sheds no light on *the manner* in which he committed the crime for which he has been convicted. Nor is it evidence that Guzek contends was unavailable to him at the time of the original trial . . . . We can find nothing in the Eighth or Fourteenth Amendments that provides a capital defendant a right to introduce new evidence of this kind at sentencing.

546 U.S. 517, 523 (2006). Three factors led the Court to conclude that a trial court could exclude the type of residual doubt evidence that Guzek wanted to assert. The Court held that such evidence could be excluded because residual doubt evidence concerns whether the defendant committed the crime, and sentencing proceedings are concerned with how the defendant committed the crime; the issue to which the evidence is relevant had already been litigated; and Oregon law allowed a defendant to admit any evidence at the resentencing proceeding that had been admitted at Guzek's first trial. *Id.* at 526.

¶40     *Guzek* resolved the issue of whether a death penalty defendant has a constitutional right to present residual doubt evidence in his sentencing proceeding: "We can find nothing in the Eighth or Fourteenth Amendments that provides a capital defendant a right to introduce new [residual doubt] evidence . . . at sentencing." *Id.* at 523; *see also State v.*

20

*Tucker* (*Tucker II*), 215 Ariz. 298, 318, ¶ 79, 160 P.3d 177, 197 (2007), *cert. denied*, 128 S. Ct. 296 (2007) (a defendant "does not have an Eighth Amendment right to introduce [residual doubt] evidence at the penalty phase"); *State v. Andriano,* 215 Ariz. 497, 506, ¶ 45, 161 P.3d 540, 549 (2007), *cert. denied*, 128 S. Ct. 297 (2007) ("Both the United States Supreme Court and this Court have rejected the argument that a capital defendant must be allowed to present residual doubt evidence in mitigation."); *State v. Ellison,* 213 Ariz. 116, 136, ¶ 82, 140 P.3d 899, 919 (2006), *cert. denied*, 127 S. Ct. 506 (2006) ("[T]here is no constitutional requirement that the sentencing proceeding jury revisit the prior guilty verdict by considering evidence of 'residual doubt.'"). Therefore, Harrod had no constitutional right to present residual doubt evidence at his resentencing proceeding.

**¶41** Harrod also claims that A.R.S. § 13-703(G) permits residual doubt evidence as a mitigating factor at the penalty phase. Section 13-703(G) provides that "[t]he trier of fact shall consider as mitigating circumstances *any factors* proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and *any of the circumstances of the offense*." (Emphasis added.)

Harrod contends that the emphasized language requires admission of residual doubt evidence.

¶**42**     Despite the broad language in A.R.S. § 13-703(G), the purpose of a capital sentencing is to shed light on factors such as the egregious nature of the crime, the manner in which the defendant committed the crime, and the defendant's motivation. *See Guzek,* 546 U.S. at 523, 526; *see also State v. Anderson*, 210 Ariz. 327, 348, ¶ 86, 111 P.3d 369, 390 (2005) ("The only issue at the aggravation phase is whether any aggravating circumstances have been proved; the only issue during the penalty phase is whether death is the appropriate sentence.").

¶**43**     Residual doubt evidence challenges a jury's finding of guilt.  And because the penalty phase does not determine whether a defendant is guilty, the "circumstances of the offense" language in § 13-703(G) does not authorize a defendant to present residual doubt evidence.  Rather this language relates to such factors, among others, as to how a defendant committed first degree murder.

¶**44**     In addition, Arizona's overall death penalty statutory scheme prohibits a subsequent jury from retrying "the issue of the defendant's guilt."  *See* A.R.S. § 13-703.01(J)-(L) (Supp. 2007).  The plain language of provisions J through L of section 13-703.01, as amended in 2002, makes residual doubt evidence

22

irrelevant to capital resentencing proceedings.[10]    2002 Ariz.

Sess. Laws, ch. 1, § 3 (5th Spec. Sess.).   For example, section

13-703.01(J) states in part that:

> At the aggravation phase, if the trier of fact is a
> jury, [and] the jury is unable to reach a verdict on
> any of the alleged aggravating circumstances and the
> jury has not found that at least one of the alleged
> aggravating circumstances has been proven, the court
> shall dismiss the jury and shall impanel a new jury.
> The new jury *shall not retry the issue of the
> defendant's guilt* . . . .

(Emphasis added.)   Section 13-703.01(K) further declares:

> At the penalty phase, if the trier of fact is a jury
> and the jury is unable to reach a verdict, the court
> shall dismiss the jury and shall impanel a new jury.
> The new jury *shall not retry the issue of the
> defendant's guilt* . . . .

(Emphasis added.)   Finally, A.R.S. § 13-703.01(L) states

the following:

> If the jury that rendered a verdict of guilty is not
> the jury first impaneled for the aggravation phase,
> the jury impaneled in the aggravation phase *shall not
> retry the issue of the defendant's guilt*.   If the jury
> impaneled in the aggravation phase is unable to reach
> a verdict on any of the alleged aggravating
> circumstances and the jury has not found that at least
> one of the alleged aggravating circumstances has been
> proven, the court shall dismiss the jury and shall
> impanel a new jury.   The new jury *shall not retry the
> issue of the defendant's guilt* . . . .

(Emphasis added.)   Consequently, A.R.S. § 13-703.01(J)-(L)

precludes the introduction of residual doubt evidence at the

penalty phase.

---

[10]    Section    13-703.01(N)    (Supp.    2007)    requires    that
resentencing occur under section 13-703.01.

23

¶45     Harrod argues that at least three post-*Ring II* Arizona cases have explicitly recognized the right to present residual doubt evidence at the penalty phase: *State v. Lamar*, 210 Ariz. 571, 576, ¶ 21, 115 P.3d 611, 616 (2005), *State v. Nordstrom*, 206 Ariz. 242, 247, ¶ 20, 77 P.3d 40, 45 (2003), and *State v. Jones*, 205 Ariz. 445, 451, ¶ 25, 72 P.3d 1264, 1270 (2003).  But these cases do not support his argument.  In all three cases, in which this Court examined whether a judge-imposed death sentence was harmless error under the criteria set forth in *Ring III*, residual doubt was offered as a non-statutory mitigating factor, but the trial judges never found the factor to be proven. *Lamar*, 210 Ariz. at 576, ¶ 21, 115 P.3d at 616; *Nordstrom*, 206 Ariz. at 247, ¶ 20, 77 P.3d at 45; *Jones*, 205 Ariz. at 451, ¶ 25, 72 P.3d at 1270.  Although the opinions mention residual doubt as a non-statutory mitigating factor, they neither discuss nor approve of the presentation of residual doubt as a mitigating factor in a *Ring III* resentencing.  *See Lamar*, 210 Ariz. at 576, ¶ 21, 115 P.3d at 616; *Nordstrom,* 206 Ariz. at 247, ¶ 20, 77 P.3d at 45; *Jones*, 205 Ariz. at 451, ¶ 25, 72 P.3d at 1270.

¶46     Accordingly, we hold that Harrod did not have a constitutional or statutory right to present residual doubt evidence at his resentencing proceeding.  Thus, it was not error for the trial court to rule that Harrod could not present

24

residual doubt evidence, including the results of a polygraph examination and assertions of innocence during allocution.

VII

¶47        Harrod next claims that the penalty phase instructions and form of verdict, taken as a whole, impermissibly created and shifted the burden of proof, resulting in a "presumption of death" in violation of *State ex rel. Thomas v. Granville* (*Baldwin*)*,* 211 Ariz. 468, 123 P.3d 662 (2005).

¶48        This Court reviews de novo whether penalty phase jury instructions are correct statements of law.   *Id*. at 471, ¶ 8, 123 P.3d at 665.   If the defendant failed to object to the incorrect jury instructions, they will be reviewed for fundamental error.   *State v. Henderson*, 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005).

¶49        Harrod argues that the following instruction was erroneous:

> If no jurors find the defendant proved any mitigation
> by a preponderance of the evidence, you must return a
> verdict of death.

We recently rejected virtually the same argument regarding an identical jury instruction.   In *Tucker II*, we held that the above instruction did not create an impermissible "'presumption' of death."   215 Ariz. at 317, ¶ 73, 160 P.3d at 196.   We concluded that "[s]uch a directive does not violate the Eighth Amendment so long as jurors are allowed to consider any

25

mitigating evidence." *Id*.  Here, several jury instructions informed jurors that they could find mitigating factors from anything presented during the resentencing proceeding.[11]  The instructions in this case, as in *Tucker II*, also made clear in several places that Harrod did not have the burden to establish that the mitigating evidence was sufficiently substantial to call for leniency.[12]  Therefore, the jury instructions here, taken as a whole, did not create a "presumption of death."

---

[11]  For example, on the issue of mitigation evidence that could be considered, the jury was instructed that:

> Mitigation includes anything offered by the defendant or the state before or during this phase of the trial helpful in determining whether to impose a sentence less than death.

And:

> You are not limited to these mitigating circumstances, or any others suggested by the parties.  You may also consider any other information admitted as evidence during the aggravation phase or the penalty phase that is relevant in determining whether to impose a sentence less than death so long as it relates to an aspect of the defendant's background, character, propensities, record, or circumstances of the offense.

[12]  On the issue of whether the mitigation was sufficiently substantial to call for leniency, the trial court instructed the jury that:

> Neither the state nor the defendant has the burden of proving that the weight of the mitigation is or is not sufficiently substantial to call for leniency. . . . Each juror must determine for himself or herself what is sufficiently substantial to call for leniency.

¶50     Harrod also argues that the verdict form improperly stated "the mitigation proved by the defendant," rather than suggesting that mitigation could be found anywhere in the record.  The verdict form stated the following:

> We the Jury, unanimously **do not** find with regard to the First Degree murder of Jean Tovrea, the mitigation proved by the defendant is sufficiently substantial to call for leniency and return a verdict of death.

As discussed above, however, the superior court instructed the jury that the jurors could find mitigation evidence in "anything offered by the defendant or the state before or during this phase of the trial," and that they were not "limited to [the] mitigating circumstances, or any other suggested by the parties. You may also consider any other information admitted as evidence during the aggravation phase or the penalty phase that is relevant in determining whether to impose a sentence less than death."  Given these instructions, although the verdict form could have been more precisely worded, it did not create a "presumption of death."

¶51     Harrod further claims that it was error to suggest that the jurors must vote for death if they found no mitigation evidence.  In *Tucker II,* this Court rejected such a claim: "[u]nder our sentencing scheme, . . . a juror must vote to impose a sentence of death if he or she determines there is no mitigation at all or none sufficiently substantial to warrant a

27

sentence of less than death."  215 Ariz. at 318, ¶ 74, 160 P.3d at 197.

¶52       Harrod also complains about the trial court's use of the term "weighing" in the penalty phase jury instructions.  He concedes that although such language may be "insufficient for reversal," it "worsened the problem" when presented in conjunction with language stating that Harrod must prove mitigation.  The weighing instructions provided to the jury in this case included the following two passages:

> You must make your decision about whether mitigation is sufficiently substantial to call for leniency based solely upon your weighing of any mitigation proven to you and the aggravating circumstance you have already found during the aggravation phase.  To do this, you must individually determine the nature and extent of mitigating circumstances.  Then, in light of the aggravating circumstance that has been proven to exist, you must individually determine if the totality of the mitigating circumstances is sufficiently substantial to call for leniency and a life sentence.
>
> The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them.  You are free to assign whatever value you deem appropriate to each and all of the various factors you are permitted to consider.  In weighing the various circumstances, you determine, under the relevant evidence, which penalty is justified and appropriate by considering the totality of the aggravating circumstance with the totality of the mitigating circumstances.  In reaching a reasoned, moral judgment about which penalty is justified and appropriate, you must decide how compelling or persuasive the totality of the mitigating factors is when compared against the totality of the aggravating factor.

28

¶53    *Baldwin* discouraged jury instructions that used "outweigh" language.  211 Ariz. at 473, ¶ 21, 123 P.3d at 667. *Tucker II*, however, held that an instruction that directed "the jury to 'weigh' mitigating and aggravating circumstances . . . did not constitute fundamental error."  215 Ariz. at 318, ¶ 75, 160 P.3d at 197.  Because Harrod did not object to the court's instructions here, and the "weighing" instructions do not constitute fundamental error, his argument fails.  *See State v. Prince*, 204 Ariz. 156, 158, ¶ 8, 61 P.3d 450, 452 (2003) (concluding that when a defendant does not object to a jury instruction, any complaint about the instruction is "waived, except where fundamental error is involved").

## VIII

¶54    The Tovrea murder was committed before August 1, 2002; we therefore are required to independently review the propriety of the death sentence.  A.R.S. § 13-703.04(A) (Supp. 2003).[13]  If this Court determines that "an error was made regarding a finding of aggravation or mitigation, the supreme court shall independently determine if the mitigation the supreme court finds is sufficiently substantial to warrant leniency in light of the existing aggravation."  *Id.* § 13-703.04(B).  If this Court finds "that the mitigation is sufficiently substantial to

---

[13]    *See* 2002 Ariz. Sess. Laws, ch. 1, § 7(B) (5th Spec. Sess.).

29

warrant leniency, the supreme court shall impose a life sentence . . . ." *Id.* Otherwise, we are required to affirm the death sentence. *Id.*

### A

¶55    The sole aggravating circumstance alleged by the State was that Harrod "committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." A.R.S. § 13-703(F)(5). "This factor is satisfied only 'if the expectation of pecuniary gain is a motive, cause, or impetus for the murder and not merely a result of the murder.'" *State v. Armstrong*, 208 Ariz. 360, 363, ¶ 7, 93 P.3d 1076, 1079 (2004) (quoting *State v. Hyde,* 186 Ariz. 252, 280, 921 P.2d 655, 683 (1996)).

¶56    Overwhelming evidence supports the (F)(5) aggravating factor. As detailed above, *see supra* ¶¶ 2-7, the State presented facts regarding the murder, which had every telltale sign of a murder for hire. Because this evidence proves that the motivation for the murder was financial gain, the pecuniary gain aggravator was proven beyond a reasonable doubt.

### B

¶57    Harrod presented the following non-statutory mitigating factors: uncharged co-perpetrator; impact of execution on defendant's family and friends; lack of criminal history; mental abuse by father during childhood; alcoholic

30

father; past good conduct and character; absence of other violent acts; commission of the offense was out-of-character; educational accomplishments; good behavior during pre-trial incarceration; good behavior during post-sentencing incarceration; good conduct during trial; love for and of family; and divorced parents.

1

¶58     Harrod contends that the State's failure to charge Ed Tovrea, Jr., for his participation in the murder of Jeanne was a mitigating factor. "This court occasionally will consider as a mitigating circumstance the disparity between the sentences of a defendant sentenced to death for a murder and that of an accomplice or codefendant who received a lesser sentence." *State v. Gallegos*, 178 Ariz. 1, 20, 870 P.2d 1097, 1116 (1994) (citing *State v. Schurz,* 176 Ariz. 46, 57, 859 P.2d 156, 167 (1993)).   But this mitigating circumstance "has no application when insufficient evidence exists to charge the other party with the alleged crime."  *Id.*  Although some circumstantial evidence seems to point to Ed Jr.'s involvement in Jeanne's murder, the State apparently has concluded that it does not have sufficient admissible evidence to proceed against him.  *Cf*. Ariz. R. Sup. Ct. 42, ER 3.8.  Therefore, the fact that Ed Jr. has not been charged is not a mitigating factor.  *Gallegos*, 170 Ariz. at 20, 870 P.2d at 1116.

**2**

¶59     Harrod cites as mitigating evidence the impact of execution on his family and friends and love for and of family. This Court, however, gives minimal weight to family support. *Harrod I*, 200 Ariz. at 319, ¶ 54, 26 P.3d at 502.

**3**

¶60     Harrod also presents as mitigating factors the divorce of his parents, his father's alcoholism, and his father's mental abuse. "A defendant is not required to show a nexus between the crime and the mitigation evidence before such evidence can be considered.  Rather, the only burden is to meet the low threshold of relevancy to the issue of providing 'a basis for a sentence less than death.'"  *Ellison*, 213 Ariz. at 144, ¶ 132, 140 P.3d at 927 (citations omitted).  But "the failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence." *State v. Newell,* 212 Ariz. 389, 405, ¶ 82, 132 P.3d 833, 849 (2006), *cert. denied*, 127 S. Ct. 663 (2006).  Harrod presented no evidence linking his parents' divorce, his father's alcoholism, and the mental abuse Harrod experienced to the murder; we therefore give this mitigation evidence minimal weight.

¶61     Harrod also cites as mitigating circumstances his lack of criminal history, past good conduct, absence of violent acts, educational accomplishments, the fact that the commission of the offense was out-of-character, and good conduct during trial. Although good character can be a significant mitigating factor, it deserves less weight in a case involving a murder planned in advance.[14]  *State v. Willoughby*, 181 Ariz. 530, 549, 892 P.2d 1319, 1338 (1995) (weighing significant past good conduct and good acts evidence against the (F)(5) aggravating factor).

¶62     Finally, Harrod has proven that his behavior was excellent during both his pre-trial and post-sentencing incarceration.  This is not a mitigating circumstance, however, because inmates are expected to behave well in prison.  *State v. Finch*, 202 Ariz. 410, 418, ¶ 41, 46 P.3d 421, 429 (2002).

## C

¶63     In conducting our independent review of the propriety of a death sentence, "we consider the quality and the strength, not simply the number, of aggravating and mitigating factors." *State v. Greene,* 192 Ariz. 431, 443, ¶ 60, 967 P.2d 106, 118

---

[14]   Significant evidence showed that Harrod had posed as "Gordon Phillips" to meet and interview Jeanne Tovrea in July of the year before the murder.   In addition, Anne Costello testified that Harrod spoke of the murder months before it happened.

(1998). This Court has found that the pecuniary gain aggravating factor, particularly in the case of a contract killing, is especially strong. *Willoughby*, 181 Ariz. at 549, 892 P.2d at 1338 (citing *State v. Clark*, 126 Ariz. 428, 437, 616 P.2d 888, 897 (1980) (Gordon, J., concurring) (arguing that (F)(5) should apply only when the defendant is a hired killer)). Accordingly, when a "hired hit" has taken place, the (F)(5) aggravator has substantial weight.

¶64 In light of the compelling aggravating circumstance, the mitigation evidence simply fails to rise to a level that would call for leniency. Therefore, we affirm Harrod's death sentence. *See* A.R.S. § 13-703.04(B).

**IX**

¶65 Although neither party raises the issue, Harrod was illegally sentenced to death by lethal injection. Section 13-704(B) (2001) states that "[a] defendant who is sentenced to death for an offense committed before November 23, 1992 shall choose either lethal injection or lethal gas at least twenty days before the execution date." Because the murder here was committed on March 31, 1988, Harrod must be given the choice between lethal injection and lethal gas. This Court has the power to correct an illegal sentence under A.R.S. § 13-4037(A) (2001). *See State v. Smith*, 215 Ariz. 221, 230, ¶¶ 34-35, 159 P.3d 531, 540 (2007), *cert. denied*, 128 S. Ct. 466 (2007); *see*

34

*also State v. Brewer*, 170 Ariz. 486, 493-94, 826 P.2d 783, 790-91 (1992) (discussing the Court's duty to carefully review all death sentences on direct appeal and correct illegal sentences). We modify Harrod's sentence to permit him to choose execution either by lethal injection or lethal gas.

X

¶66     Finally, Harrod raises thirteen claims to avoid preclusion in subsequent federal proceedings.   He recognizes that these claims have previously been rejected.

¶67     (1) The death penalty is *per se* cruel and unusual punishment.   This claim has been rejected by *Gregg v. Georgia*, 428 U.S. 153, 186-87 (1976); *State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992); and *State v. Gillies*, 135 Ariz. 500, 507, 662 P.2d 1007, 1014 (1983).

¶68     (2) Execution by lethal injection is cruel and unusual punishment.   We rejected this claim in *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

¶69     (3) The death statute is unconstitutional because it fails to guide the sentencing jury.   We rejected this claim in *State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

¶70     (4) The death statute unconstitutionally fails to require either cumulative consideration of multiple mitigating factors or that the jury make specific findings as to each mitigating factor.   This claim has been rejected by *State v.*

35

*Gulbrandson*, 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995); *State v. Ramirez*, 178 Ariz. 116, 131, 871 P.2d 237, 252 (1994); and *State v. Fierro*, 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990).

¶71    (5)  Arizona's statutory scheme for considering mitigating evidence is unconstitutional because it limits full consideration of that evidence.  We rejected this claim in *State v. Mata*, 125 Ariz. 233, 242, 609 P.2d 48, 57 (1980).

¶72    (6)  Arizona's death statute insufficiently channels the sentencer's discretion in imposing the death sentence.  We rejected this claim in *State v. West*, 176 Ariz. 432, 454, 862 P.2d 192, 214 (1993), *overruled on other grounds*, *State v. Rodriguez*, 192 Ariz. 58, 961 P.2d 1006 (1998); and *Greenway*, 170 Ariz. at 164, 823 P.2d at 33.

¶73    (7)  Arizona's death statute is unconstitutionally defective because it fails to require the State to prove that death is appropriate.  This claim was rejected by *Gulbrandson*, 184 Ariz. at 72, 906 P.2d at 605.

¶74    (8)  The prosecutor's discretion to seek the death penalty unconstitutionally lacks standards.  This Court rejected this argument in *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

¶75    (9)  The Constitution requires a proportionality review of a defendant's death sentence. We rejected this claim in *Salazar*, 173 Ariz. at 416, 844 P.2d at 583; and *State v. Serna*, 163 Ariz. 260, 269-70, 787 P.2d 1056, 1065-66 (1990).

36

¶76    (10) There is no meaningful distinction between capital and non-capital cases. This argument was rejected in *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

¶77    (11) Applying a death statute enacted after the Supreme Court's decision in *Ring II* violates the Ex Post Facto Clauses of the Federal and Arizona Constitutions and A.R.S. § 1-244. We rejected this claim in *Ring III*, 204 Ariz. at 545-47, ¶¶ 15-24, 65 P.3d at 926-28.

¶78    (12) The death penalty is cruel and unusual because it is irrationally and arbitrarily imposed and serves no purpose that is not adequately addressed by life in prison. This Court rejected this claim in *State v. Pandeli*, 200 Ariz. 365, 382, ¶ 88, 26 P.3d 1136, 1153 (2001), *vacated on other grounds*, *Ring II,* 536 U.S. 584; and *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

¶79    (13) To the extent this Court disagrees with Harrod's reading of *Baldwin*, Arizona's death penalty statute is unconstitutional because it requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist. This claim has been rejected by *Walton v. Arizona*, 497 U.S. 639, 651-52 (1990), *overruled on other grounds*, *Ring II*, 536 U.S. 584; *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996); and *State v. Bolton*, 182 Ariz. 290, 310, 896 P.2d 830, 850 (1995).

**XI**

¶80    For the foregoing reasons, we affirm Harrod's death sentence as modified to comply with A.R.S. § 13-704(B).


_____
                    Michael D. Ryan, Justice

CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
W. Scott Bales, Justice


_____
John C. Gemmill, Chief Judge*


*Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable John C. Gemmill, Chief Judge of the Arizona Court of Appeals, Division 1, was designated to sit in this matter.