NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

DARROL DEAN CLAYBORN, *Appellant.*

No. 1 CA-CR 17-0262
FILED 3-22-2018

Appeal from the Superior Court in Maricopa County
No.  CR2014-002137-001
The Honorable Jay R. Adleman, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Jason Lewis
*Counsel for Appellee*

Bain & Lauritano, Glendale
By Sheri M. Lauritano
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Paul J. McMurdie joined.

---

**C A M P B E L L**, Judge:

¶1        Darrol Clayborn appeals his convictions and sentences for multiple counts of aggravated assault. He argues the trial court erred by not allowing the defense to elicit testimony from a witness who had indicated he would invoke his Fifth Amendment privilege against self-incrimination. For the following reasons, we affirm.

**FACTS AND PROCEDURAL BACKGROUND[1]**

¶2        On an evening in October 2013, E.A. ("E. Weezy") threw a party at his family's apartment. His parents were out of town, and between 50 to 70 of his friends showed up throughout the night. Many of the partygoers were drinking alcohol. Clayborn and E. Weezy did not know one another at the time, but Clayborn came to the party with a mutual friend named Peanut.

¶3        In the early morning hours, after most people had left the party, an argument broke out between Clayborn and E. Weezy. E. Weezy and his older brother both asked Clayborn to leave the apartment, and Clayborn went toward the front door with Peanut. Then, instead of leaving, Clayborn turned back around, took a gun out from around his waist, and started shooting. E. Weezy and several other partygoers were hit, including A.G. ("Smash"), who was shot in the stomach. Multiple witnesses recalled hearing continuous gunfire, and at least one witness saw Smash shoot a gun at Clayborn after he ran out of the apartment. Clayborn himself was also shot in the leg.

¶4        Clayborn was indicted on four counts of attempted second degree murder, all class 2 dangerous felonies, twelve counts of aggravated assault, all class 3 dangerous felonies, and one count of misconduct

---

[1] "We view the evidence and all reasonable inferences therefrom in the light most favorable to sustaining the jury's verdicts." *State v. Miles*, 211 Ariz. 475, 476, ¶ 2 (App. 2005).

involving weapons, a class 4 dangerous felony. At trial, Clayborn presented a claim of self-defense and testified that he only drew his gun after he saw Smash draw his first.

¶5 During trial, the State informed the court that Smash had indicated he would refuse to testify. Outside the presence of the jury, the State questioned Smash about how he would answer any questions about the evening of the incident. Smash responded:

> Well, how I'm going to answer is I was intoxicated, I was on drugs, I don't remember nothing. Like I said at the hospital, the officer came to see me, I told him the same thing. Prior to that, a week after that, I was on . . . Xanax bars, Xanax, and I don't remember nothing that happened that month. I was on drugs. And from there, that's it. I plead the Fifth. I want an attorney. I'm not going to say nothing else. That's all I'm going to say.

¶6 Toward the end of the State's case-in-chief, the court addressed the issue of Smash testifying. His counsel informed the court that his client was invoking his Fifth Amendment rights, and that even if given full immunity by the State, Smash would agree to be sworn in but refuse to answer any questions. Clayborn's counsel asked that he be required to invoke his Fifth Amendment right in front of the jury. The court heard arguments from both parties but ultimately reasoned:

> On the record we made . . . it's largely unchallenged that it's a valid invocation . . . between the discussion of illegal drug use, guns, any impeachment with prior inconsistent statements, or impeachment from other witness' statements, that there's sufficient reason for any of us to believe that [Smash] could potentially, by testifying, incriminate himself as to any number of things, not the least of which would include the crimes for which Mr. Clayborn is currently on trial.
>
> So assuming . . . there is a valid invocation and there's never really been any challenge to that, part two turns to whether there was a valid purpose served by requiring the invocation to take place in front of the jury.
>
> . . .

> I just don't know that there's any material evidence that could be garnered from having him testify simply to invoke because the only thing it would effectively do is cause the jury to guess or speculate that his invocation had to do with the offenses in this case . . . . I don't believe there's a purpose to having him invoke in the presence of the jury . . . .

Accordingly, Smash did not appear before the jury as a witness.

¶7　　　　The court granted Clayborn's motion for a directed verdict on two of the counts of aggravated assault. The jury acquitted Clayborn of the four counts of attempted second degree murder, but found Clayborn guilty of the remaining ten counts of aggravated assault and found three or four aggravating circumstances associated with each count. Clayborn later pled guilty to the single count of misconduct involving weapons. The court sentenced Clayborn to two consecutive terms of 9.5 years' imprisonment.[2]

## DISCUSSION

¶8　　　　Clayborn argues the trial court abused its discretion by denying his motion to compel Smash to testify. First, Clayborn contends that Smash's invocation of the Fifth Amendment was not valid; second, Clayborn contends that even if his invocation was valid, Clayborn should have been allowed to question Smash to compel his invocation of the Fifth Amendment in front of the jury. "A trial court's decision whether to allow a party to call a witness before the jury who will assert his Fifth Amendment privilege is reviewed for an abuse of discretion." *State v. Harrod*, 218 Ariz. 268, 275, ¶ 19 (2008).

¶9　　　　Defendants have a Sixth Amendment right to "offer the testimony of witnesses, and to compel their attendance, if necessary, in order to present a defense." *Id.* at ¶ 20 (quoting *Washington v. Texas*, 288 U.S. 14, 19 (1967)). When a witness asserts a Fifth Amendment right against self-incrimination, however, "the trial court must balance the interests of the defendant with those of the witness." *State v. Rosas-Hernandez*, 202 Ariz. 212, 216, ¶ 10 (App. 2002) (citation omitted). If the witness validly invokes the Fifth Amendment privilege by "showing a reasonable ground to apprehend danger to [himself] from his being compelled to answer, the defendant's right to compulsory process must yield to the witness's privilege not to incriminate himself." *Id.* at 216, ¶ 10 (citations omitted); *see also State v.*

---

　　　　[2] This sentence was also consecutive to his sentence in CR2013-433944-001.

*Martinez*, 218 Ariz. 421, 428, ¶ 27 (2008) ("[W]hen a witness has continued reason to fear prosecution, the defendant's Sixth Amendment right to compel that witness's testimony may be properly limited." (citations omitted)). "There is no Sixth Amendment right to compel a witness to testify if the facts support that the witness has properly claimed the Fifth Amendment privilege." *Rosas-Hernandez*, 202 Ariz. at 216, ¶ 10 (citations omitted).

¶10        The trial court may excuse a witness only "when the trial judge has extensive knowledge of the case and rules that the Fifth Amendment would be properly invoked in response to all relevant questions that the party calling the witness plans on asking." *Harrod*, 218 Ariz. at 276, ¶ 21 (citation omitted). "The witness must provide the court with a factual predicate from which the court can evaluate the claim of privilege," but the court need not "personally question the witness if it can gain the necessary information by other means." *Rosas-Hernandez*, 202 Ariz. at 217, ¶ 17 (citations omitted).

¶11        Clayborn argues first that "the trial court did not go deeper into what areas the witness was facing potential incrimination" and it was therefore "premature to allow him to refuse to testify," as "[n]o showing was made on the record as to any incrimination that could occur." The trial court, however, had already heard almost the entirety of the State's case by the time it made the decision not to force Smash to testify, which included the testimony of seven partygoers and four responding police officers. One police officer testified that, through their investigations, the police ascertained there were "two separate shooting incidents," but had so far been unable to determine the identity of the second shooter. The officer testified he had never heard anyone "say[] anything definitively" about the identity of the second shooter until hearing the testimony of the other witnesses in court. The officer also testified that it was possible—though not probable—that Smash reached for his gun first, and Clayborn saw this and managed to draw and shoot his own gun more quickly.

¶12        Not only did the trial court already have extensive knowledge of the case, but given the possibility that Smash's testimony may have led to self-incrimination for the "second shooting," the court had evidence to conclude that Smash had a factual predicate for invoking the Fifth Amendment. *See id.* at 217, ¶ 17. Furthermore, Clayborn did not object at trial to the validity of Smash's invocation of his Fifth Amendment right nor ask the court to "go deeper into what areas the witness was facing potential incrimination." As the trial court noted, *supra* ¶ 6, "on the record we made, . . . it's largely unchallenged that it's a valid invocation." Rather, Clayborn

does so for the first time here and has therefore waived that argument on appeal. *See Englert v. Carondelet Health Network*, 199 Ariz. 21, 26, ¶ 13 (App. 2000) ("[W]e generally do not consider issues, even constitutional issues, raised for the first time on appeal.").

¶13 Next, Clayborn argues that—even if there was a proper showing that Smash's testimony would be self-incriminating—he was required to invoke the Fifth Amendment's protection in front of the jury. It is, however, "well settled that in criminal cases the jury is not entitled to draw any inferences from the decision of a witness to exercise his Fifth Amendment privilege." *State v. McDaniel*, 136 Ariz. 188, 194 (1983), *abrogated on other grounds by State v. Walton*, 159 Ariz. 571 (App. 1989) (citations omitted); *see also State v. Corrales*, 138 Ariz. 583, 588 (1983) ("The decision to permit counsel to call a witness who has indicated he or she will refuse to testify is ordinarily discretionary with the trial court, which must determine whether the interest of the person calling the witness outweighs the possible prejudice resulting from the inferences the jury may draw from the witness' exercise of the privilege." (citations omitted)).

¶14 Here, we agree with the trial court. There was no material evidence to be garnered from requiring Smash to invoke the Fifth Amendment in front of the jury. The only discernible purpose of such a requirement would be to create the prejudicial impression that Smash was invoking the Fifth Amendment because he was himself somehow implicated in wrongdoing—an inference that the jury was not entitled to draw. Therefore, the trial court did not abuse its discretion in not allowing the defense to call Smash as a witness only to invoke the Fifth Amendment in front of the jury.

## CONCLUSION

¶15 For the foregoing reasons, we affirm Clayborn's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED:   AA