SUPREME COURT OF ARIZONA

STATE OF ARIZONA,                    )  Arizona Supreme Court
                                     )  No.  CR-00-0595-AP
                                     )
                         Appellee,   )  Pima County
                                     )  Superior Court
                                     )  No.  CR-61846
              v.                     )
                                     )
                                     )
SHAD DANIEL ARMSTRONG,               )
                                     )  **SUPPLEMENTAL OPINION**
                                     )
                         Appellant.  )
_____)


Appeal from the Superior Court in Pima County
The Honorable Howard Hantman, Judge

**DEATH SENTENCES VACATED; REMANDED FOR RESENTENCING**

_____

JANET A. NAPOLITANO, FORMER ARIZONA ATTORNEY GENERAL      Phoenix
TERRY GODDARD, ARIZONA ATTORNEY GENERAL
      by   Kent E. Cattani, Chief Counsel,
           Capital Litigation Section
     and   Robert L. Ellman, Assistant Attorney General
           James P. Beene, Assistant Attorney General
           John P. Todd, Assistant Attorney General
           Bruce M. Ferg, Assistant Attorney General      Tucson
           Donna J. Lam, Assistant Attorney General
Attorneys for State of Arizona

LAW OFFICES OF HARRIETTE P. LEVITT                         Tucson
      by   Harriette P. Levitt
Attorney for Shad Daniel Armstrong

_____

**B E R C H,** Justice

¶1      Shad Daniel Armstrong was sentenced to death under a procedure found unconstitutional in *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002) (*Ring II*).  In *Ring II*, the United States Supreme Court held that Arizona's capital sentencing scheme violated the defendant's Sixth Amendment right to a jury trial.  *Id*. at 609, 122 S. Ct. at 2443.[1]  In doing so, the Court held that defendants "are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."  *Id*. at 589, 122 S. Ct. at 2432.  The Court remanded the case for further proceedings consistent with its decision.  *Id*. at 609, 122 S. Ct. at 2443.

¶2      On remand, we consolidated all death penalty cases in which this court had not yet issued a direct appeal mandate, including Armstrong's case, to determine whether *Ring II* required reversal or vacatur of the death sentences.  *State v. Ring*, 204 Ariz. 534, 544, ¶¶ 5-6, 65 P.3d 915, 925 (2003) (*Ring III*).  We concluded that we must review each death sentence imposed under Arizona's superseded capital sentencing statute for harmless error.  *Id*. at 555, ¶ 53, 65 P.3d at 936.

¶3      We now consider whether the death sentence imposed on Armstrong can stand in light of *Ring II* and *Ring III*.

---

[1]      The legislature has amended the capital statute so that sentencing factors in capital cases are now tried before juries.  *See* 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 1.

**FACTS AND PROCEDURAL HISTORY**

¶4 On March 10, 2000, a jury found Shad Daniel Armstrong guilty of two counts of first degree murder and one count of conspiracy to commit murder for the murders of his sister, Farrah Armstrong, and her fiancé, Frank Williams. See *State v. Armstrong*, ___ Ariz. ___, ___ P.3d ___ (2004), for a detailed account of the facts of this case.

¶5 Following the jury's verdict, the trial judge conducted a sentencing hearing at which he found two aggravating circumstances beyond a reasonable doubt: that Armstrong murdered Farrah because he expected to receive something of pecuniary value and that Armstrong had been convicted of one or more other homicides committed during the course of the offense. *See* Ariz. Rev. Stat. ("A.R.S.") § 13-703(F)(5), (F)(8) (Supp. 1998). These findings rendered Armstrong eligible for the death penalty. *Id.* § 13-703(E). The trial judge found the mitigating circumstances Armstrong presented at the sentencing hearing "insufficient to call for leniency" and sentenced Armstrong to death for each murder conviction. We now review whether, in light of *Ring II* and *Ring III*, the death sentences imposed on Armstrong can stand.

**DISCUSSION**

¶6     In *Ring III*, we concluded that judicial fact-finding in the capital sentencing process may constitute harmless error if we can conclude beyond a reasonable doubt that no reasonable jury would fail to find the aggravating circumstance.   204 Ariz. at 555, 565, ¶¶ 53, 103, 65 P.3d at 936, 946.   In *Schriro v. Summerlin*, ___ U.S. ___, ___, 124 S. Ct. 2519, 2526 (2004), the Supreme Court held that *Ring II* "announced a new procedural rule that does not apply retroactively to cases already final on direct review."   *Ring II* errors thus appear to be trial errors that may be reviewed for harmless error.   We therefore examine whether the *Ring II* error was harmless with respect to the aggravating circumstances found by the trial judge in Armstrong's case.

**A.    Aggravating Circumstances**

    1.    Pecuniary Gain

¶7     Arizona law makes the commission of a murder "for the receipt, or in expectation of the receipt, of anything of pecuniary value" an aggravating circumstance.   A.R.S. § 13-703(F)(5).   This factor is satisfied only "if the expectation of pecuniary gain is a motive, cause, or impetus for the murder and not merely a result of the murder."   *State v. Hyde*, 186 Ariz. 252, 280, 921 P.2d 655, 683 (1996).   It is not enough merely to show that a defendant took property or money after a murder

- 4 -

occurred.[2]  *State v. Wallace*, 151 Ariz. 362, 368, 728 P.2d 232, 238 (1986) (citing *State v. Gillies*, 135 Ariz. 500, 512, 662 P.2d 1007, 1019 (1983)).  The (F)(5) inquiry is "highly fact-intensive" and requires the State to "establish the connection between the murder and motive through direct or strong circumstantial evidence."  *Ring III*, 204 Ariz. at 560, ¶ 76, 65 P.3d at 941 (citing *State v. Cañez*, 202 Ariz. 133, 159, ¶ 94, 42 P.3d 564, 590 (2002)).

¶8     In this case, the trial judge found that Armstrong had a pecuniary motive to murder Farrah.[3]  The trial judge found that Armstrong's discussions with co-conspirator David Doogan before the murders about taking Farrah's property, combined with Armstrong's deliberate actions in taking property after killing

---

[2]     *Ring III* cites former Vice Chief Justice Gordon's concurring opinion in *State v. Harding*, 137 Ariz. 278, 296-97, 670 P.2d 383, 401-02 (1983) (interpreting the holding of *State v. Clark*, 126 Ariz. 428, 436, 616 P.2d 888, 896 (1980)), for the proposition that the (F)(5) aggravating factor requires proof "that the murder would not have occurred *but for* the defendant's pecuniary motive."  *Ring III*, 204 Ariz. at 560, ¶ 30, 65 P.3d at 941 (emphasis added).  While this statement accurately interprets Justice Gordon's concurring opinion, the majority in *State v. Clark*, the case upon which Justice Gordon relied as authority for his position in *Harding*, stated only that the (F)(5) factor should be found "if the receipt of money is established as *a cause of* the murders."  126 Ariz. at 436, 616 P.2d at 896 (emphasis added).  The latter statement accurately reflects Arizona law on this point.  The *but for* test is not required by A.R.S. § 13-703(F)(5) or Arizona caselaw.

[3]     The trial judge found no pecuniary motive for Frank's murder; rather, he found that "[t]he motive for the murder of Frank Williams was the defendant's hatred of Frank Williams."

Farrah and Frank, established "strong circumstantial evidence that pecuniary gain was a motive to kill Farrah." Armstrong challenges both the strength and scope of this circumstantial evidence.

¶9     We will not find harmless the finding of an (F)(5) aggravating factor if circumstantial evidence and witness credibility could be weighed differently by a jury than it was by the sentencing judge. *State v. Hoskins*, 204 Ariz. 572, 574, ¶ 6, 65 P.3d 953, 955 (2003); *State v. Rutledge*, 206 Ariz. 172, 175, ¶ 14, 76 P.3d 443, 446 (2003). That Armstrong had a pecuniary motive to murder Farrah is a plausible inference that may be drawn from the circumstantial evidence, but it is not the only reasonable inference that may be drawn. Because a reasonable jury could differently assess the evidence upon which the trial judge based his pecuniary gain finding, we cannot conclude that the trial court's finding of the (F)(5) factor was harmless.

## 2.    Multiple Homicides

¶10     Arizona law also lists as an aggravating circumstance that "[t]he defendant has been convicted of one or more other homicides . . . committed during the commission of the offense." A.R.S. § 13-703(F)(8). In *Ring III*, we held that when a "defendant stipulates, confesses or admits to facts sufficient to establish an aggravating circumstance, we will regard that

factor as established."  204 Ariz. at 563, ¶ 93, 65 P.3d at 944.
In this case, Armstrong conceded "that [the (F)(8)] aggravating
factors have been met by the State as a result of the jury
verdicts as to both murder counts."

**¶11**     *Ring III* makes clear, however, that while the finding
of an (F)(8) aggravator is subject to a harmless error analysis,
the finding may not be based solely on the jury's verdict of
guilt on multiple homicides.  204 Ariz. at 561, ¶ 81, 65 P.3d at
942.   Rather, the murders must be "temporally, spatially and
motivationally related."   *Id.* (citing *State v. Rogovich*, 188
Ariz. 38, 45, 932 P.2d 794, 801 (1997)).   Here, Armstrong
clearly conceded not only that there were multiple homicides in
this case, but also that the State had established the (F)(8)
aggravator.    But because the language of that concession
indicates that it was based on the multiple convictions alone
and does not address the temporal, spatial, or motivational
requirements, it is possible that he did not admit "facts
sufficient to establish [the (F)(8) factor]."  *See id.* at 563, ¶
93, 65 P.3d at 944.   A thorough examination of the scope of
Armstrong's concession is unnecessary, however, as the record
before us demonstrates a temporal, spatial, and motivational
relationship substantial enough that no reasonable jury could
fail to find the (F)(8) aggravator beyond a reasonable doubt.

¶12     At oral argument, Armstrong's counsel stated that the temporal and spatial relationship was "obvious." We agree with this concession. This court has found a *temporal* relationship between multiple homicides committed, as these were, within moments of each other. *State v. Dann*, 206 Ariz. 371, 373, ¶ 9, 79 P.3d 58, 60 (2003) (finding a temporal relationship when undisputed evidence showed that the murders occurred in a "short, uninterrupted span of time"); *see also State v. Lavers*, 168 Ariz. 376, 394, 814 P.2d 333, 351 (1991) (finding a temporal relationship existed where "the two murders were separated by just minutes"). The evidence in the current case reveals that Farrah and Frank were murdered within seconds of one another. David Doogan testified that Armstrong walked into the room where Frank and Farrah were seated, shot Frank in the chest, immediately turned to Farrah and shot her once in the chest and once in the head, and then turned back to Frank and shot him in the head as well. Based on this evidence, we conclude that a reasonable jury could not have failed to find that the murders were temporally related.

¶13     Similarly, we have affirmed the *spatial* relationship when the victims were killed in close physical proximity to each other. *Dann*, 206 Ariz. at 373, ¶ 8, 79 P.3d at 60 (finding a spatial relationship where all three victims "died in the front room of [an] apartment, where they had been seated near one

another"). In the current case, as in *Dann*, the victims were murdered in a living room area as Farrah sat on a couch and Frank sat next to her on a recliner. We find that a reasonable jury could not have failed to find that the murders were spatially related.

¶14 Finally, the *motivational* relationship is shown by the substantial evidence that Armstrong killed both Farrah and Frank to avoid having to go back to prison. The undisputed evidence at trial was that before her murder, Farrah had indicated that she would turn herself and Armstrong in to Oklahoma authorities for a burglary they had committed two years earlier. David Doogan and Rusty Medina, Armstrong's girlfriend at the time of the murders, both testified that Armstrong moved to Arizona after the burglary to avoid detection, because he would "rather die than go back to prison." Doogan and Medina further testified that Armstrong began planning to murder Farrah and Frank after learning of Farrah's intention to turn him in to Oklahoma authorities.

¶15 As evidence of a disparity in the motives for the two murders, Armstrong points to the trial court's statement that his motive for killing Frank was his "hatred of Frank." Although relevant to the issue of motivation, we conclude that this statement does not dictate the determination of that factor under *Ring III*'s (F)(8) analysis.

¶16     We note initially that the trial judge made this statement with regard to the pecuniary gain factor, not the multiple homicide factor.  He observed that Armstrong killed Frank because he hated him and not for pecuniary gain.  This statement reflected the trial judge's assessment of Armstrong's lack of pecuniary motive for killing Frank.  It does not necessarily reflect his assessment of the relationship between Armstrong's motive for killing Farrah and his motive for killing Frank.

¶17     Additionally, the evidence in the record shows that Armstrong hated Frank because he believed that Frank was encouraging Farrah to turn him in to law-enforcement authorities.  Indeed, Doogan testified that at one point Armstrong intended to kill only Frank so that he could exert more influence over Farrah and prevent her from turning him in.  Consequently, even if Armstrong killed Frank because he hated him, such motivation is inextricably intertwined with his motivation for killing Farrah:  his desire not to be pursued by Oklahoma authorities. *Cf. State v. Tucker*, 205 Ariz. 157, 169, ¶ 66, 68 P.3d 110, 122 (2003) (finding the motivational element of the (F)(8) aggravator satisfied after finding it "difficult to imagine a motive for the killings unrelated to the murder of [the primary victim]").

**¶18**      In *Dann*, we found the motivational relationship to be satisfied if "a jury may differ as to [the defendant's] precise motive for killing [the other victims, but] no jury would fail to find that his motives were related to the murder of [the primary victim]." 206 Ariz. at 374, ¶ 10, 79 P.3d at 61. We similarly conclude that even if a jury could differ in determining the precise reason Armstrong murdered Frank, no reasonable jury could find that motive to be unrelated to his motive for the murder of Farrah.

**¶19**      Given the uncontroverted evidence on these points, we conclude that no reasonable jury could have found other than that the two murders in this case were temporally, spatially, and motivationally related. We therefore conclude that the *Ring II* error in the (F)(8) finding is harmless.

**B.   Mitigating Circumstances**

**¶20**      Our harmless error inquiry does not end with an examination of the aggravating circumstances. In *Ring III*, we held that "[b]ecause a trier of fact must determine whether mitigating circumstances call for leniency, we will affirm a capital sentence only if we conclude, beyond a reasonable doubt, that no rational trier of fact would determine that the mitigating circumstances were sufficiently substantial to call for leniency." 204 Ariz. at 565, ¶ 104, 65 P.3d at 946. The State of Arizona challenged this procedure by writ of certiorari

to the United States Supreme Court in *State v. Pandeli*, ___ U.S. ___, 124 S. Ct. 386 (2003). In its supplemental brief in Armstrong's case, the State conceded that remand on the issue of mitigation is necessary under this court's mitigation analysis in *Ring III* and *Pandeli*, but asked us to stay any mandate "until such time as the United States Supreme Court has adjudicated the petitions for certiorari in *Pandeli*." Recently, the United States Supreme Court denied certiorari in *Pandeli*, *id*. We therefore review the mitigation under the standard of review we set forth in *Ring III*, 204 Ariz. at 565, ¶ 104, 65 P.3d at 946, bearing in mind the State's concession.

¶21    At his sentencing hearing, Armstrong offered nineteen mitigating circumstances for the court's consideration. Two of these factors were statutory:  impairment, and "unusual and substantial duress," A.R.S. § 13-703(G)(1), (G)(2). Seventeen factors were non-statutory:  (1) diabetes; (2) duress; (3) anti-social personality disorder; (4) mood disorder; (5) stress; (6) history of substance abuse; (7) troubled, abusive, or dysfunctional family; (8) good employment history; (9) care and support of family; (10) education and accomplishments; (11) efforts at rehabilitation; (12) lack of previous record for violent crime; (13) effect of death sentence on his children; (14) record of good behavior while incarcerated; (15) lack of future dangerousness; (16) sentence disparity between Doogan and

- 12 -

Armstrong; and (17) proportionality of sentence.

¶22   The trial judge expressly did not find the (G)(1) statutory mitigating factor and impliedly found that Armstrong had failed to establish the (G)(2) factor.  He did find, however, that Armstrong proved seven of the non-statutory mitigating factors offered:  that Armstrong had a difficult childhood; that he had completed his G.E.D. during previous imprisonment; that he had made efforts at rehabilitation during previous imprisonment; that he had no history of violence other than the murders; that a death sentence would affect his children; that he had behaved well while incarcerated; and that he was a caring parent.  Although the trial judge found that Armstrong had proved these seven mitigating factors, he afforded them "minimal weight" and determined that they were "insufficient to call for leniency for each murder."

¶23   Based on the conflicting evidence in this record on these issues, we cannot conclude beyond a reasonable doubt that no rational jury would find otherwise.  After reviewing the evidence, we cannot say that a jury would not have found additional mitigating factors or weighed differently the mitigating factors that were found.  Furthermore, we cannot say beyond a reasonable doubt that if a jury had found additional mitigating circumstances or weighed the mitigating circumstances differently, it would not have found them "sufficiently

substantial to call for leniency." A.R.S. § 13-703(E). Therefore we conclude that the *Ring II* error was not harmless in this case.

## CONCLUSION

**¶24** Although we find harmless the trial judge's finding of the (F)(8) aggravating circumstance, we conclude that a reasonable jury could differ in finding the (F)(5) aggravating circumstance, in finding and weighing the mitigating circumstances offered by Armstrong, and in its ultimate determination whether the death penalty should be imposed. Consequently, we vacate Armstrong's death sentences and remand for resentencing.

_____
Rebecca White Berch, Justice


CONCURRING:


_____
Ruth V. McGregor, Vice Chief Justice

_____
Michael D. Ryan, Justice

**J O N E S, Chief Justice, concurring in part, dissenting in part:**

¶25     I concur in the resentencing determination announced in the Supplemental Opinion.  I respectfully dissent, however, from the notion that the denial of trial by jury on sentence enhancement factors in violation of the Sixth Amendment is subject to harmless error analysis by a reviewing court on direct appeal.

¶26     The Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000), a non-capital case, concluded that a Sixth Amendment violation occurs when the trial judge alone determines that sentencing enhancement factors exist, thereby increasing the sentence beyond the maximum prescribed by statute.  The Court reasoned that such factors amount to "the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict" and that enhancement factors under the "functional equivalency" standard must be presented to and determined by the jury in order to satisfy the mandate of the Sixth Amendment.  *Id.* at 490.

¶27     Moreover, a concurring opinion in *Apprendi* reminds us forcefully that the Sixth Amendment "means what it says" -- that the right to trial by an impartial jury "has no intelligible content unless it means that all the facts which must exist in order to subject the defendant to a legally prescribed

- 15 -

punishment *must* be found by the jury."  *Id*. at 499 (Scalia, J.) (emphasis in original).

¶28     Two years after *Apprendi*, the Court extended the rule to capital cases, holding, under Arizona's sentencing statutes, that enhancement facts authorizing the death penalty must be presented to and determined by the jury.  *Ring v. Arizona*, 536 U.S. 584 (2002) (*Ring II*).  *Ring II* expressly overruled *Walton v. Arizona*, 497 U.S. 639 (1990), in which, twelve years earlier, the Court upheld Arizona's judge sentencing scheme in capital cases even though the procedure then in use called for the trial judge, not the jury, to find the aggravating facts that could result in the death sentence.  The *Ring II* Court observed emphatically that *Walton* and *Apprendi* were "irreconcilable," that the Court's current Sixth Amendment jurisprudence "cannot be home to both," and that because Arizona's statutory aggravating factors operated as "the functional equivalent of an element of a greater offense," the Sixth Amendment, consistent with *Apprendi*, required that they be found by the jury.  536 U.S. at 609.

¶29     The announcement of *Apprendi* and *Ring II* necessarily signaled the inevitable arrival of related issues.  For example, would *Ring II* apply retroactively to cases in which the direct appeal process had become final?; and would sentence enhancement

findings made by the trial judge in violation of the Sixth Amendment be subject to analysis for harmless error?

¶30     Both questions have now been raised and have provoked the familiar debate between substance and procedure, as well as the difference between structural error and trial error. Matters of substance are generally subject to retroactive application and are more likely to escape harmless error analysis, while matters of procedure are normally not applied retroactively and are generally subject to harmless error analysis. *Apprendi* and *Ring II* prompt the question addressed in the Supplemental Opinion in the instant case and in this dissent: whether denial of the Sixth Amendment right to trial by jury may be analyzed as procedural and thus treated as harmless error?

¶31     Based primarily on the rationale set forth in *Apprendi* and *Ring II*, I have posited that harmless error analysis cannot legitimately be applied to jury denial, or at least that it should not be so applied, for several reasons: (a) because the constitutional sanctity of trial by jury preserves a right "implicit in the concept of ordered liberty," *Teague v. Lane*, 489 U.S. 288, 311 (1989); (b) because fact determinations involving statutory enhancement factors form the sole basis for the imposition of enhanced punishment, including capital punishment; and (c) because a sentence enhancement factor

allowing sentencing beyond the maximum has been *substantively* defined as "the functional equivalent of an element of a greater offense," *Apprendi*, 530 U.S. at 494 n.19.

¶32    Given this rationale, and because both *Apprendi* and *Ring II* are now law, it has seemed to me that when the right to jury trial has been abridged in these circumstances, there can be no legitimate foundation on which to perform harmless error analysis of the evidentiary weight to be accorded aggravating factors that resulted in an enhanced sentence, including, of course, a capital sentence.

¶33    But in the aftermath of *Apprendi* and *Ring II* and their progeny, the Supreme Court decided *Schriro v. Summerlin*, ___ U.S. ___, 124 S. Ct. 2519 (2004). *Summerlin* holds that *Ring II* shall not be applied retroactively to cases in which the direct appeal process is complete and the final mandate of the court has issued.[4]   The *Summerlin* Court explicitly defines the rule announced in *Ring II* as a "new procedural rule," not a rule of substance.   *Id.* at ___, 124 S. Ct. at 2526.   *Summerlin* further states the jury guarantee does not rise to the level of a "watershed rule of criminal procedure implicating the fundamental fairness and *accuracy of the criminal proceeding.*"

---

[4]    The Supreme Court's decision in *Summerlin* is fully consistent with this court's unanimous opinion in *State v. Towery*, 204 Ariz. 386, 64 P.3d 828, *cert. denied*, ___ U.S. ___, 124 S. Ct. 44 (2003).

- 18 -

*Id.* at \_\_\_, 124 S. Ct. at 2525; *see also Saffle v. Parks*, 494 U.S. 484 (1990); *Teague v. Lane*, 489 U.S. 288 (1989). I believe the "new procedural rule" holding in *Summerlin* is at odds with the substantive "functional equivalency" standard espoused in *Apprendi* and *Ring II*.

¶34     Nevertheless, now that the Sixth Amendment right to jury trial has been defined by *Summerlin* as a "new procedural rule" limited to prospective application, it would appear my view that erroneous jury denial is substantive and thus not subject to harmless error analysis, is on shaky ground. The shakiness is even more apparent in view of the recent Supreme Court denial of certiorari in *Arizona v. Sansing*, 206 Ariz. 232, 77 P.3d 30 (2003), *cert. denied*, \_\_\_ U.S. \_\_\_ (2004), in which this court, the dissent notwithstanding, affirmed the judge-imposed death penalty on the basis that error in denying the defendant's right to trial by jury, was harmless.

¶35     Therefore, because of *Summerlin* and *Sansing*, together with the added weight of the Supremacy Clause, I am constrained to think the view I have advanced -- that denial of the Sixth Amendment right to trial by jury is not susceptible to harmless error analysis -- is, at best, on life support with little hope of survival. I take some comfort, perhaps undeserved, in the fact that *Summerlin,* as well as *Apprendi* and *Ring II*, were not decided unanimously and that I am thus not entirely alone with

my opinion that the right to jury trial under the Sixth Amendment is significantly more than a new procedural rule.

¶36 *Summerlin* dealt with retroactivity, not harmless error. Accordingly, the door to argument against harmless error analysis remains ajar, albeit ever so slightly. I therefore register my dissent on the issue, though probably for the last time.

¶37 On remand for resentencing, a jury will consider all aggravating and mitigating factors in Armstrong's case. I concur in that result.

_____
Charles E. Jones
Chief Justice