SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-06-0443-AP |
| Appellee, | ) |
| | ) Pima County |
| v. | ) Superior Court |
| | ) No. CR-61846 |
| SHAD DANIEL ARMSTRONG, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Pima County
The Honorable Christopher Browning, Judge

**AFFIRMED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel
          Capital Litigation Section
          Donna J. Lam, Assistant Attorney General      Tucson
Attorneys for State of Arizona

LAW OFFICES OF HARRIETTE P. LEVITT                         Tucson
     By   Harriette P. Levitt
Attorney for Shad Daniel Armstrong
_____

**B A L E S**, Justice

¶1      This automatic appeal is from a jury's determination that Shad Daniel Armstrong should receive death sentences for two murders.  We have jurisdiction pursuant to Article 6, Section 5(3) of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 13-4031 (2001).

**FACTS AND PROCEDURAL HISTORY**

¶2      In 2000, a jury convicted Armstrong of murdering, and

conspiring to murder, his sister Farrah Armstrong and her fiancé Frank Williams. The trial judge imposed death sentences for each murder after finding two aggravators: Armstrong had murdered Farrah for pecuniary gain, A.R.S. § 13-703(F)(5) (Supp. 1998), and had committed multiple murders, A.R.S. § 13-703(F)(8). This Court affirmed the convictions. *State v. Armstrong* (*Armstrong I*), 208 Ariz. 345, 360 ¶ 74, 93 P.3d 1061, 1076 (2004).

¶3       Armstrong was sentenced under a procedure later found unconstitutional in *Ring v. Arizona* (*Ring II*), 536 U.S. 584 (2002). In reviewing Armstrong's death sentences, this Court considered whether it was harmless error for the trial judge, rather than a jury, to have found the aggravating factors and to have determined that death sentences were appropriate. *State v. Armstrong* (*Armstrong II*), 208 Ariz. 360, 366 ¶ 24, 93 P.3d 1076, 1082 (2004). The Court found harmless the trial judge's finding of the (F)(8) multiple murders aggravator. *Id.* Resentencing was required, however, because the Court concluded that a reasonable jury could reach different conclusions than had the trial judge regarding the (F)(5) pecuniary gain aggravator and the significance of the mitigating circumstances. *Id.*

¶4       In 2006, a new jury found the (F)(8) multiple murders aggravator, but not the (F)(5) aggravator, and determined that Armstrong should be sentenced to death for each murder. This

2

appeal followed.

¶5      The facts related to the murders, which are described in more detail in *Armstrong I*, 208 Ariz. at 347-50 ¶¶ 2-22, 93 P.3d at 1063-66, are as follows.  In 1996, Armstrong lived in Oklahoma with his girlfriend Russette Medina and his sister Farrah.  Armstrong and Farrah burglarized a home in Texas.  After Armstrong learned that Oklahoma authorities were looking for him, he fled to Tucson with Medina, Medina's daughter, and Farrah.

¶6      In Tucson, Farrah met Williams.  They became romantically involved and moved into an apartment together.  Armstrong and Medina could not afford rent, so they moved in with Williams and Farrah.  Tensions grew in the apartment.  Medina and Armstrong frequently clashed, and Farrah was upset with Armstrong because of an unpaid cable bill.  In early 1998, Armstrong left the apartment and moved in with his friend David Doogan.  They lived in a trailer in Three Points, Arizona, belonging to Doogan's father.  Later, Medina, her daughter, and another child fathered by Armstrong also moved to the trailer in Three Points.

¶7      Meanwhile, Farrah and Williams visited Farrah's parents in Oklahoma.  They shared their plans to move there and get married.  Farrah discussed with her parents her need to resolve her outstanding legal problems.  After returning to

3

Tucson in early February, Farrah told Medina about her plans to return to Oklahoma and turn herself over to authorities. She also told Medina that in order to get favorable treatment, she planned to tell the Oklahoma authorities where Armstrong was located.

¶8 Medina told Armstrong about his sister's plans. He became angry and worried that he would go to prison and that he and Medina would lose custody of their children. Shortly after, Armstrong discussed Farrah's plans with Doogan and the pair started plotting to kill Farrah and Williams.

¶9 Several days before the murders, Armstrong and Doogan dug a grave near the trailer. On the afternoon of February 19, 1998, Armstrong asked Farrah to come to Three Points because he had money for the unpaid cable bill. He also asked her to bring Williams because they needed his help with Doogan's car. Armstrong had Medina and the children go to a different trailer so the children would not see Farrah arrive. To further prepare for the murders, Doogan and Armstrong hung sheets on the walls and gathered plastic bags and a blanket to cover the bodies. Armstrong also loaded a shotgun with deer slugs.

¶10 Near dusk, Farrah and Williams drove up to the property, Doogan opened the front door, and Armstrong hid with the shotgun. As Farrah and Williams approached the trailer, Doogan waved Armstrong off. Armstrong put down the gun and

4

greeted Farrah and Williams. Eventually everyone was in the living room. Farrah sat on a couch, Williams sat on a recliner, and Doogan sat on a chair opposite Williams. As Doogan talked with Farrah and Williams, Armstrong retrieved the shotgun. He returned to the living room and shot Williams in the chest. Armstrong shot Farrah twice, first in the chest and then in the head. He then shot Williams in the head.

¶11 Doogan and Armstrong disposed of the bodies. They placed a plastic bag over Williams' head and wrapped the blanket around both bodies. They could not easily carry the bodies, so they dragged them outside and used a truck to pull the blanket to the open grave. They pushed the bodies into the hole and partially filled it with dirt. They then moved the bloody couch and recliner into the truck bed. Armstrong gathered some of the bloody sheets, put them in the hole with the bodies, and finished filling the grave. By that time, Medina had returned to the main trailer and soon they all got in the truck and left Three Points. They dumped the furniture in the desert and headed to Williams and Farrah's apartment, where they took some electronic items and Farrah's jewelry.

¶12 On the Sunday after the killings, Doogan's neighbor called and asked Doogan if he knew where Armstrong was. Doogan, following Armstrong's directions, said that Armstrong had left for Michigan. Armstrong immediately prepared to leave

5

town.  Armstrong, Medina, and the children spent several months in Los Angeles before relocating to Odessa, Texas.  Despite these evasive maneuvers, an investigation was already in progress.  A friend of Williams and Farrah called the police about their disappearance, and authorities discovered the blood-stained furniture in the desert.  Doogan's father also contacted the police.  The police obtained a search warrant for the Three Points property, discovered the bodies, and began searching for Armstrong and Medina.  Nearly a year after the killings, authorities arrested them in Texas.

## DISCUSSION

¶13    Armstrong raises nine issues on appeal.  For the reasons discussed below, we affirm his death sentences.

### A.  A.R.S. § 13-703.02 and A.R.S. § 13-703.03

¶14    Armstrong argues that the trial court erred by not requiring, before his resentencing trial, pre-trial evaluations under A.R.S. § 13-703.02 (Supp. 2007) to determine if Armstrong is mentally retarded or under A.R.S. § 13-703.03 (Supp. 2007) to determine his competency to stand trial.  Because Armstrong did not object to the trial court's failure to order these evaluations, we will review solely for fundamental error, which requires Armstrong to show "both that fundamental error exists and that the error in his case caused him prejudice."  *State v. Henderson*, 210 Ariz. 561, 567 ¶ 20, 115 P.3d 601, 607 (2005).

6

¶15      The current version of § 13-703.02, in effect at the time of Armstrong's resentencing trial, applies to resentencing proceedings. *See* 2002 Ariz. Sess. Laws., ch. 1, § 7 (5th Spec. Sess.) ("13-703.02 . . . as amended by this act . . . appl[ies] to any sentencing or resentencing proceeding on any first degree murder case that is held after the effective date of this act.") Because Armstrong's resentencing was "held after the effective date" of the 2002 modification to A.R.S. § 13-703.02, the trial court erred in not using the prescreening procedures outlined in that statute.

¶16      Armstrong cannot show, however, that he was prejudiced by the trial court's failure to order a prescreening evaluation for mental retardation. We have refused to order a new hearing on mental retardation when there was no evidence "rais[ing] any doubt as to whether [the defendant] may be mentally retarded." *State v. Dann*, 206 Ariz. 371, 376 ¶ 21, 79 P.3d 58, 63 (2003). Armstrong does not argue that he is mentally retarded, nor does any evidence raise doubt about whether Armstrong is mentally retarded. Although the trial court should have followed the procedures in A.R.S. § 13-703.02, the failure to do so does not require reversal or a hearing on mental retardation.

¶17      We have never resolved whether A.R.S. § 13-703.03 applies at resentencing. *See State v. Harrod*, 218 Ariz. 268, 277 ¶ 28, 183 P.3d 519, 528 (2008) (declining to decide whether

7

"§ 13-703.03 . . . appl[ies] to capital resentencings"). Section 13-703.03(A) requires the trial court to start the screening process "[i]f the state files a notice of intent to seek the death penalty." Here the State filed such a notice in March 1999, well before the adoption of A.R.S. § 13-703.03. Unlike § 13-703.02, there is no language indicating the legislature's intent to apply competency prescreening to resentencing proceedings.

¶18    Because Armstrong is unable to show prejudice, we need not resolve whether A.R.S. § 13-703.03(A) applies to resentencing trials or applies only at the initial pre-trial phase following the State's notification of intent to seek the death penalty. *Cf. Harrod*, 218 Ariz. at 278 ¶ 33, 183 P.3d at 529 (holding "any error in not ordering an evaluation under A.R.S. § 13-703.03(A)" harmless because nothing in the record suggested the defendant was incompetent).

¶19    Armstrong points to two facts to suggest he may have been incompetent to stand trial: (1) at his first sentencing hearing, he put on evidence indicating he behaved irrationally around the time of the murders; and, (2) at the resentencing, he introduced information of a mental health history, including a diagnosis for bipolar disorder. These facts, however, do not suggest that at trial he lacked an ability "to make a reasoned choice among alternatives, with an understanding of the

8

consequences of the choice." *State v. Kayer*, 194 Ariz. 423, 434 ¶ 38, 984 P.2d 31, 42 (1999). Because no evidence suggests Armstrong may have been incompetent to stand trial in 2006, any error did not prejudice him.

## B. The transcript of David Doogan's testimony

¶20 Armstrong next argues that the admission of a transcript of David Doogan's guilt phase testimony was error because parts of it were irrelevant and prejudicial. He also argues that the transcript violated his Sixth Amendment right to confrontation. We review evidentiary rulings for an abuse of discretion. *State v. Tucker*, 215 Ariz. 298, 314 ¶ 58, 160 P.3d 177, 193 (2007). Evidentiary rulings based on constitutional law or statutory construction, however, are reviewed de novo. *See id*. at 315 ¶ 61, 160 P.3d at 194. Because Armstrong objected below, we will review any error under the harmless error standard. *Henderson*, 210 Ariz. at 567 ¶ 18, 115 P.3d at 607. "Harmless error review places the burden on the state to prove beyond a reasonable doubt that the error did not contribute to or affect the . . . sentence." *Id*.

¶21 David Doogan testified extensively at Armstrong's guilt phase trial. The State planned to call Doogan as a witness during the resentencing trial, but he refused to testify. Armstrong moved to preclude the State from offering the transcript of Doogan's prior testimony, arguing that its

admission would violate the Sixth Amendment Confrontation Clause and the rules of evidence.

¶22    The trial court denied the motion, reasoning that A.R.S. § 13-703 (Supp. 2006) allowed the resentencing jury to hear anything the first jury heard, the transcript was relevant, and there was no confrontation problem because Armstrong had an opportunity to cross-examine Doogan at the first trial. During the aggravation phase, the State read to the jury Doogan's direct examination.

### 1.    Evidentiary ruling

¶23    The trial court based its decision to allow Doogan's testimony at least partially on a faulty interpretation of A.R.S. § 13-703 (Supp. 2007) and A.R.S. § 13-703.01 (Supp. 2007). The judge thought that the statutes stated that the new jury is "entitled to consider anything or any evidence . . . that was adduced at the guilt phase of the trial."

¶24    This is an incorrect interpretation of our statutes. As we have stated before, "evidence admitted at the guilt proceeding is deemed admitted at a sentencing proceeding *only if* the trier of fact is the same in both" proceedings. *State v. Ellison*, 213 Ariz. 116, 136 ¶ 80, 140 P.3d 899, 919 (2006); *see also* A.R.S. § 13-703(D) ("Evidence that is admitted at the trial and that relates to any aggravating or mitigating circumstances shall be deemed admitted as evidence at a sentencing proceeding

10

if the trier of fact considering that evidence is the same trier of fact that determined the defendant's guilt."). Indeed, A.R.S. § 13-703(B) commands that "[a]t the aggravation phase . . . the admissibility of information relevant to any of the aggravating circumstances . . . shall be governed by the rules of evidence." Thus, it would have been error to allow Doogan's transcript solely because the guilt phase jury had heard the testimony.

¶25 The trial court, however, did not admit Doogan's testimony for this reason alone; it also determined that the evidence was relevant. Evidence is relevant if it tends to make the existence of some fact of consequence more or less probable. Ariz. R. Evid. 401. Rule 403 gives the judge discretion to exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice," among other considerations. Ariz. R. Evid. 403.

¶26 Armstrong advances two theories to support his argument that the Doogan transcript was irrelevant or too prejudicial. First, Armstrong argues that substantial portions of Doogan's testimony were irrelevant to the (F)(5) pecuniary gain aggravator or the (F)(8) multiple murders aggravator. Specifically, Armstrong suggests that Doogan's testimony on the following topics was irrelevant: planning the murders; digging the grave and burying the bodies; removing the furniture and

11

cleaning the trailer; and Armstrong's fleeing from Arizona.

¶27    The details of the crime, including the planning and execution of the murders, were relevant to both the (F)(5) and (F)(8) aggravators.  In addition, evidence regarding the blood-stained furniture corroborated testimony regarding the location of the murder, a fact relevant to the (F)(8) aggravator.  The details of Armstrong's flight were relevant to the (F)(5) pecuniary gain aggravator because the evidence included the theft of items from Williams and Farrah's apartment that Armstrong later pawned.  To the extent some of the information was minimally relevant, it was not overly prejudicial.  Indeed, Armstrong admits that the most inflammatory details from Doogan's testimony – where and how the violence occurred – were relevant to the (F)(8) multiple murders aggravator.  The judge's determination that Doogan's testimony was relevant was not an abuse of discretion.

¶28    Second, Armstrong argues that Doogan's transcript was overly prejudicial because he was willing to concede the existence of the (F)(8) multiple murders aggravator.  Armstrong sought to prevent the State from proving (F)(8) because this Court had "conclude[d] that no reasonable jury could have found other than that the two murders . . . were temporally, spatially, and motivationally related."  *Armstrong II*, 208 Ariz. at 365 ¶ 19, 93 P.3d at 1081.  The trial court allowed the State

12

to prove (F)(8), reasoning that the State was "obligated to secure a jury finding," notwithstanding this Court's holding that the previous judicial determination that (F)(8) existed was harmless error.

¶29    In effect, Armstrong asked the judge to repeat the same harmless error that occurred at the first trial.  We rejected a similar argument in *State v. Pandeli* (*Pandeli IV*), 215 Ariz. 514, 522 ¶ 15, 161 P.3d 557, 565 (2007).  There, we held that even if a judge's finding of an aggravating circumstance was harmless error, when a death sentence was vacated and remanded for resentencing, "the State was obligated to re-prove the . . . aggravating circumstance on resentencing." *Id.*  Moreover, A.R.S. § 13-703.01(P) requires the jury to make "all factual determinations required by this section or the Constitution of the United States or this state to impose a death sentence."

¶30    Armstrong's original sentence was vacated and remanded for resentencing; therefore, the State was obligated to prove any aggravating circumstance to the jury.  *Armstrong II*, 208 Ariz. at 366 ¶ 24, 93 P.3d at 1082.  There was no abuse of discretion.

## 2. Confrontation Clause and Rule 19.3(c)

¶31    Armstrong also contends that the admission of the transcript of Doogan's testimony violated his Sixth Amendment

13

Confrontation Clause right because he did not have a meaningful opportunity to cross-examine Doogan. At trial, he also argued that admitting the transcript violated Rule 19.3(c) of the Arizona Rules of Criminal Procedure, which states that former testimony is admissible if "[t]he party against whom the former testimony is offered . . . had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which the party now has."

¶32    The Confrontation Clause prohibits the admission of testimonial hearsay unless (1) the declarant is unavailable and (2) the defendant "had a prior opportunity to cross-examine" the declarant. *Crawford v. Washington*, 541 U.S. 36, 59 (2004); *see also State v. McGill*, 213 Ariz. 147, 159 ¶ 51, 140 P.3d 930, 942 (2006) (noting that the Confrontation Clause applies to testimonial hearsay used to establish an aggravating circumstance).

¶33    We need not decide whether the admission of the transcript in the aggravation phase caused error because any error was harmless beyond a reasonable doubt. Violations of the Confrontation Clause do not result in automatic reversal. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). Because the jury found the State did not prove the (F)(5) aggravator and because the Confrontation Clause and Rule 19.3(c) would not have prohibited the admission of the transcript as mitigation

14

rebuttal during the penalty phase, the only way Doogan's transcript could have impermissibly affected the verdict is with respect to the finding of the (F)(8) multiple murders aggravator. *See McGill*, 213 Ariz. at 159 ¶ 52, 140 P.3d at 942 (holding that the Confrontation Clause did not prohibit the admission of testimonial hearsay to rebut defendant's mitigation).

¶34 Apart from Doogan's prior testimony, the State presented other evidence sufficient to establish the (F)(8) aggravating circumstance. Specifically, Medina testified that she heard four shots and saw Armstrong and Doogan dragging the bodies from the trailer to the pre-dug grave. Medina also testified that Armstrong told her how the murders occurred, including that he shot Williams and Farrah in the living room and that he shot them each in the chest and the head. Finally, she testified that Armstrong told her he planned to kill the victims because Farrah intended to turn him over to Oklahoma authorities. It is clear that any error "did not contribute to or affect the . . . sentence." *Henderson*, 210 Ariz. at 567 ¶ 18, 115 P.3d at 607.

C. **Other evidentiary rulings**

¶35 As discussed above, the trial court mistakenly believed that A.R.S. §§ 13-703 and 13-703.01 authorized at resentencing the admission of all evidence admitted at the

15

earlier trial. In addition to David Doogan's testimony, the trial court relied on this interpretation to overrule Armstrong's objections to other evidence and lines of questioning during the aggravation phase. Armstrong argues that the trial court's rulings caused reversible error by allowing the jury to improperly consider large amounts of evidence.

¶36 In support of his argument, Armstrong asserts that A.R.S. § 13-703.01(G) and *State v. Gulbrandson*, 184 Ariz. 46, 66, 906 P.2d 579, 599 (1995), should have limited the admission of evidence. Armstrong argues that the evidence allowed during the aggravation phase went far beyond that necessary to prove the aggravating circumstances, contrary to language in *Gulbrandson* that a fact-finder must "give aggravating weight only to evidence that tends to establish an aggravating circumstance." 184 Ariz. at 66, 906 P.2d at 599. We are unconvinced. Armstrong does not point to any specific evidence that was irrelevant or overly prejudicial, nor does he explain how the evidence resulted in the jury "giv[ing] aggravating weight" to evidence that does not "tend[] to establish an aggravating circumstance." *Gulbrandson*, 184 Ariz. at 66, 906 P.2d at 599.

¶37 Armstrong also suggests that the language in A.R.S. § 13-703.01(G) allowing the State to "present any evidence that demonstrates that the defendant should not be shown leniency"

16

should be interpreted with *Gulbrandson* in mind, such that the state's right to present rebuttal evidence in the penalty phase is limited to rebutting specific mitigating circumstances advanced by the defendant. Armstrong is misguided for two reasons. First, A.R.S. § 13-703.01(G) regulates the admission of evidence at the penalty phase; everything Armstrong references was introduced during the aggravation phase. Indeed, the State offered little rebuttal evidence during the penalty phase. Armstrong fails to identify any evidence admitted in rebuttal that went outside the scope of A.R.S. § 13-703.01(G).

¶38        Second, we have made clear that the underlying facts of a murder are relevant during the penalty phase because they tend to show whether the defendant should be shown leniency. *State v. Roque*, 213 Ariz. 193, 220-21 ¶¶ 107, 110, 141 P.3d 368, 395-96 (2006). Thus, to the extent Armstrong argues that the jury was prejudiced during the penalty phase by evidence describing details of his crime that may not have been especially relevant to the aggravating circumstances, that argument has no merit.

### D. Victim impact statement

¶39        Armstrong alleges that the victim impact statement of Julie Williams, Frank Williams' mother, violated the Eighth Amendment and caused reversible error. "The admission of victim impact evidence is reviewed for abuse of discretion." *State v.*

17

*Garza*, 216 Ariz. 56, 69 ¶ 60, 163 P.3d 1006, 1019 (2007).

## 1. Constitutionality of A.R.S. § 13-703.01(R)

¶40     Armstrong argues that A.R.S. § 13-703.01(R), the statute regulating victim statements, is unconstitutional. This statute provides:

> At the penalty phase, the victim may present information about the murdered person and the impact of the murder on the victim and other family members and may submit a victim impact statement in any format to the trier of fact.

¶41     First, Armstrong contends that victim impact statements are irrelevant to legitimate jury considerations. We rejected this argument in *Ellison*, 213 Ariz. at 140-41 ¶¶ 111-14, 140 P.3d at 923-24 ("These statements are relevant to the issue of the harm caused by the defendant . . . [and] do not violate the Eighth Amendment.") (citing *Lynn v. Reinstein*, 205 Ariz. 186, 191 ¶ 17, 68 P.3d 412, 417 (2003)).

¶42     Second, Armstrong contends that A.R.S. § 13-703.01(R) unconstitutionally contravenes the Supreme Court's rulemaking authority. *See* Ariz. Const. art. VI, § 5(5). This argument is meritless.

¶43     The Arizona constitution grants a limited authority to the legislature to make rules "that define, implement, preserve, and protect the specific rights unique and peculiar to crime victims, as guaranteed and created by the" Victims' Bill of Rights ("VBR"). *State v. Hansen*, 215 Ariz. 287, 290 ¶ 12, 160

18

P.3d 166, 169 (quoting *State ex rel. Napolitano v. Brown*, 194 Ariz. 340, 343 ¶ 11, 982 P.2d 815, 818 (1999)); *see* Ariz. Const. art. II, § 2.1(D) (granting limited rulemaking authority to the legislature under the VBR). Section 2.1(A)(4) of the VBR grants victims of crime the right "[t]o be heard at any proceeding involving . . . sentencing." Thus, the legislature exercised legitimate constitutional power to establish A.R.S. § 13-703.01(R).

## 2. Prejudicial impact

¶44        Aside from the constitutional challenge, Armstrong argues that the court abused its discretion by allowing Ms. Williams to give her statement after the close of mitigation evidence and before Armstrong's allocution. The Constitution places limits on victim statements: a statement violates due process if it is "so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). Armstrong contends that the timing, along with the substance of the statement, made the statement unduly prejudicial.

### a. Timing

¶45        The parties disagreed about when during the penalty phase Ms. Williams should have made her statement. Armstrong wanted the statement to come before opening statements to avoid the implication that Ms. Williams was a mitigation witness.

19

After some deliberation, the court decided that Ms. Williams would give her statement after the State offered mitigation rebuttal evidence and before Armstrong's allocution.

¶46    According to Armstrong, this placement of the victim statement "negated" his mitigation evidence, diminished any effect his allocution might have had, and impermissibly turned her statement, which is not evidence, into "an advisory to the jury on how to weigh the mitigating evidence."

¶47    Armstrong's arguments are unpersuasive.  We have held that "[v]ictim impact statements . . . are generally relevant to rebut mitigation."  *Garza*, 216 Ariz. at 69 ¶ 60 n.12, 163 P.3d at 1019 n.12.  Thus, although the statement may have affected how the jury assessed the mitigation evidence, that effect does not violate the Constitution.

¶48    The judge acted within his discretion in resolving the dispute about timing as he did.  The timing in this case was not unusual, and similar challenges have been rejected.  In *State v. Carreon*, the Court rejected the argument that "the admission of victim impact statements after the introduction of . . . mitigation evidence unduly prejudiced the jury."  210 Ariz. 54, 72 ¶¶ 90-93, 107 P.3d 900, 918 (2005) (reasoning that the "law permits victim impact evidence to rebut the defendant's presentation of mitigation").  Although Ms. Williams' statement came after the State concluded its presentation of rebuttal

20

evidence, rather than during the State's rebuttal, the statement immediately followed the State's case; the State's formal separation of Ms. Williams' statement cannot be said to have caused undue prejudice.

¶49     Finally, the trial court instructed the jury regarding victim impact statements immediately after Ms. Williams' statement. Armstrong does not contend that the instruction was inadequate or that the jury disregarded it. *See State v. Newell*, 212 Ariz. 389, 403 ¶ 68, 132 P.3d 833, 847 (2006) ("We presume that the jurors followed the court's instructions.").

### b.   Content of the statement

¶50     Armstrong argues Ms. Williams made statements that fell outside the permissible scope of what victims may say at a capital sentencing. In particular, he notes that she said that when she learned she was pregnant with Williams, she also learned that her mother and husband had been seriously injured in separate accidents. In addition, she said her ex-husband "beat [her] senseless" and "kidnapped [her] daughter," taking the daughter out of the country. She also discussed her grandchild, Williams' son Brandon, and the child's various health problems.

¶51     Armstrong claims that Ms. Williams' comments were inappropriate and prejudicial because they served only to create compassion for Ms. Williams that was not based on the impact of

21

her son's death. Although some of her comments had an attenuated relationship to the impact of the crime on its victims, and for that reason might properly have been excluded by the trial court, Ms. Williams' statement was not "so unduly prejudicial that it render[ed] the trial fundamentally unfair." *Payne*, 501 U.S. at 825.

¶52 After the remarks described above, Ms. Williams described Frank and Farrah, their engagement, and how pleased she was to see them happy. She ended her statement by describing how the murders negatively affected her family and Brandon in particular because he lacked a fatherly figure in his life. Following Ms. Williams' remarks, the judge immediately instructed the jury, "[T]his information is not a new aggravating circumstance, and you cannot consider it as such. It must not be the basis for purely emotional response to the defendant's actions." He further explained that the "law . . . allows [the jury] to see the victim of the murder . . . as a unique person and to see the loss resulting from his murder."

¶53 When considered in context, and in light of the trial court's instructions, Ms. Williams' remarks in the victim impact statement were not unduly prejudicial.

### E. Armstrong's Allocution

¶54 Armstrong next contends that the trial court erred by unconstitutionally restricting his right to allocution. We

22

review questions of constitutional and statutory interpretation de novo. Because Armstrong objected below, any error is subject to harmless error review. *Henderson*, 210 Ariz. at 567 ¶ 18, 115 P.3d at 607.

¶55 Armstrong listed remorse among the mitigating circumstances he intended to prove during the penalty phase. The State subsequently gave notice that, as part of its mitigation rebuttal, it intended to present Armstrong's testimony at his first trial denying culpability for the killings. After the State gave this notice, Armstrong withdrew remorse as a mitigating circumstance, causing the State to withdraw Armstrong's prior testimony from its intended rebuttal. The trial court made clear, however, that if Armstrong expressed remorse during his allocution, the State would be permitted to reopen its rebuttal case and present Armstrong's prior testimony denying responsibility for the crime.

¶56 Before closing arguments, Armstrong allocuted but did not explicitly express remorse. He stated his love for his sister and his inability to understand how he could have killed her and Williams. He told the jury that he could not explain his actions, that it was a "senseless act," and that what he did was "beyond forgiveness." Finally, he asked the jury for mercy. The State did not ask the court to reopen the case for rebuttal.

¶57 Armstrong contends that these circumstances

23

impermissibly limited his ability to express remorse in allocution.

¶58    In Arizona, a defendant has a right to allocute before he is sentenced.  Ariz. R. Crim. P. 19.1(d)(7), 26.10(b)(1).  This right, however, "is not absolute." *State v. Anderson*, 210 Ariz. 327, 350 ¶ 100, 111 P.3d 369, 392 (2005).

¶59    We agree that a defendant should be able to express remorse at a capital sentencing.  In this case, however, that right was not denied.  Armstrong remained free to express remorse, but he declined to do so.  In effect, Armstrong argues that he should have been able to shift a mitigating circumstance from his mitigation case into his allocution and thereby insulate that mitigating circumstance from rebuttal evidence.  If Armstrong had presented remorse as a mitigating circumstance as he originally intended, the State undoubtedly would have been able to present rebuttal evidence.  *See* A.R.S. § 13-703.01(G).  The judge acted within his discretion in ruling that Armstrong could not avoid mitigation rebuttal simply by making statements in allocution that he otherwise would have made as part of his mitigation case.

### F. Sufficiency of evidence for (F)(8)

¶60    Armstrong argues that the State presented insufficient evidence to prove the existence of the (F)(8) multiple murders aggravating circumstance.  We consider this issue as part of our

24

independent review.  *See* A.R.S. § 13-703.04(A) (Supp. 2007).

### G. Previously rejected arguments

¶61     Armstrong raises three other arguments that we have rejected in prior cases.

¶62     One: The trial court refused to instruct the jury or to allow defense counsel to argue that mercy in and of itself can be a mitigating circumstance.  We previously held that mercy is not a mitigating circumstance.  *State v. Andriano*, 215 Ariz. 497, 507 ¶¶ 47-49, 161 P.3d 540, 550 (2007).  Consistent with *Andriano*, the trial court allowed Armstrong to argue, and defense counsel did argue, that mercy is appropriate based on the mitigation evidence presented.

¶63     Two: The trial court caused fundamental error by not providing the jury with a specific mitigation verdict form.  We rejected this argument in *State v. Roseberry*, 210 Ariz. 360, 373 ¶ 74 & n.12, 111 P.3d 402, 415 & n.12 (2005).

¶64     Three: The Arizona death penalty statutes are unconstitutional because they fail to provide adequate standards or guidance to jurors to determine whether a death sentence is appropriate and they require the accused to prove he should not be executed.  We rejected the first contention in *State v. Pandeli* (*Pandeli I*), 200 Ariz. 365, 382 ¶ 90, 26 P.3d 1136, 1153 (2001), *vacated on other grounds by Pandeli v. Arizona* (*Pandeli II*), 536 U.S. 953 (2002); we rejected the second in *State v.*

25

*Ring* (*Ring I*), 200 Ariz. 267, 284 ¶ 64, 25 P.3d 1139, 1156 (2001), *rev'd on other grounds by Ring II*, 536 U.S. at 584.

**INDEPENDENT REVIEW**

**¶65** Because the murders occurred before August 1, 2002, we must "independently review the trial court's findings of aggravation and mitigation and the propriety of the death sentence." A.R.S. § 13-703.04(A); 2002 Ariz. Sess. Laws, ch. 1, § 7 (5th Spec. Sess.).

## A. Aggravating circumstance

**¶66** The jury found one aggravating circumstance: "The defendant has been convicted of one or more other homicides . . . that were committed during the commission of the offense." A.R.S. § 13-703(F)(8).

**¶67** The fact that a "first degree murder and one or more other homicides occur[red] around the same time" does not alone establish the (F)(8) aggravating circumstance. *State v. Ring* (*Ring III*), 204 Ariz. 534, 560 ¶ 80, 65 P.3d 915, 941 (2003). The State must establish beyond a reasonable doubt that the murders were "temporally, spatially, and motivationally related, taking place during 'one continuous course of criminal conduct.'" *State v. Prasertphong*, 206 Ariz. 167, 170 ¶ 15, 76 P.3d 438, 441 (2003) (quoting *State v. Rogovich*, 188 Ariz. 38, 45, 932 P.2d 794, 801 (1997)).

**¶68** Armstrong does not dispute that the murders were

26

temporally and spatially related; he contests only the State's proof of a motivational relationship. The motives for killing each victim need not be identical. In *Dann*, the defendant went to an apartment to kill one person, but also killed two others "because they were there" and because one of them was a witness. 206 Ariz. at 374 ¶ 10, 79 P.3d at 61. The Court held "that while a jury may differ as to [the defendant's] precise motive for killing [the two additional victims], no jury would fail to find that his motives were related to the murder of [the originally targeted victim]." *Id.*

¶69    Armstrong's overriding motive to kill was his desire to avoid apprehension by the Oklahoma authorities. Both Medina and Doogan testified that when Armstrong learned of Farrah's plan to notify the authorities, he started planning to kill her and Williams to stop her from doing so.

¶70    Armstrong argues that he killed Williams for the separate reason that he simply hated him and he interfered with Armstrong's control over Farrah. He cites Medina's testimony that Armstrong "just said he didn't like [Williams]" and the fact that an initial plan was to kill only Williams. The testimony reveals, however, that part of the reason Armstrong hated and wanted to kill Williams was that, in his view, Williams had too much influence over Farrah, and if he killed only Farrah, then Williams might turn Armstrong over to the

27

authorities anyway.

¶71     As we noted in *Armstrong II*, "even if Armstrong killed [Williams] because he hated him, such motivation is intextricably intertwined with his motivation for killing Farrah: his desire not to be pursued by Oklahoma authorities." 208 Ariz. at 364-65 ¶ 17, 93 P.3d at 1080-81.  The State proved (F)(8) beyond a reasonable doubt.

## B.  Mitigating circumstances

¶72     During the penalty phase, the State and the defendant "may present any evidence . . . relevant to . . . whether there is mitigation that is sufficiently substantial to call for leniency."  A.R.S. § 13-703.01(G).  The defendant has the burden to prove any mitigating circumstance by a preponderance of the evidence, but is not limited to an enumerated list of mitigating circumstances.  A.R.S. § 13-703(C), (G).

¶73     Armstrong presented evidence of five non-statutory mitigating circumstances: difficult family history, mental illness, compassionate nature, good behavior in structured environment, and impact of death sentence on family.  We consider each in turn.

### 1.  Difficult family history

¶74     The Court considers a difficult family history in mitigation.  *State v. Boggs*, __ Ariz. __, __ ¶ 94, 185 P.3d 111, 130 (2008).  Although we do not require a causal nexus between

28

the mitigating circumstance and the murders, the "lack of a causal nexus between a difficult personal life and the murders lessens the effect of this mitigation." *Id*. (citing *Garza*, 216 Ariz. at 73 ¶ 84, 163 P.3d at 1023.

¶75    Armstrong presented evidence that his early childhood years lacked stability. His father was an alcoholic who abused his mother and left the family soon after Armstrong was born. Armstrong was often left in the care of his grandmother, and his mother married two more times by the time Armstrong was seven years old. His grandmother died when he was about thirteen, and he was unable to attend her funeral. He subsequently dropped out of school and began getting in trouble with authorities. He spent much of his teen years in foster care and group homes. He also presented evidence of various health problems he suffered as an infant, some of which can increase the risk of future violent behavior.

¶76    Armstrong suggests this history is causally connected to the murder of Farrah because he felt a sense of abandonment when he learned of Farrah's plans similar to the sense he felt when his grandmother died. Any suggestion that Farrah's murder was an uncontrolled emotional response to a feeling of abandonment is suspect in light of Armstrong's lengthy and detailed planning to murder her. Although Armstrong has established that he had a troubled and unstable upbringing, in this case we accord it

29

little mitigating weight.

### 2. Mental health problems

**¶77**     This Court considers poor mental health a mitigating factor, but without a causal nexus to the crime, its weight is minimal.  *Boggs*, __ Ariz. at __ ¶ 94, 185 P.3d at 130.  In addition, the Court "weigh[s] mental health mitigation in proportion to a defendant's ability to conform or appreciate the wrongfulness of his conduct."  *Id*. (internal quotation marks and citations omitted).

**¶78**     Armstrong presented evidence that he was once diagnosed with bipolar disorder.  He also presented evidence that he displayed symptoms of attention deficit hyperactivity disorder, although he was never so diagnosed.  No testimony or evidence suggests Armstrong had a diminished ability "to conform or appreciate the wrongfulness of his conduct."  *Id*. Accordingly, we give his mental health history little mitigating weight.

### 3. Compassionate nature

**¶79**     "Past good conduct and character is a relevant mitigating circumstance," but "a single good deed, removed in time from the crime, does not rise to that level."  *State v. Greene*, 192 Ariz. 431, 443 ¶ 57, 967 P.2d 106, 118 (1998). Armstrong presented evidence that he was protective of a childhood friend's younger sister.  A teacher and a foster

parent also described him as a loving person. This evidence of Armstrong's compassionate nature is entitled to little mitigating weight, however, because the evidence of compassion is far removed from the crime and the facts of the crime rebut the idea that Armstrong is a compassionate and loving person. *See Harrod*, 218 Ariz. at 283 ¶ 61, 183 P.3d at 534 (noting that "[a]lthough good character can be a significant mitigating factor, it deserves less weight in a case involving a murder planned in advance").

### 4. Good behavior in structured environment

¶80     Armstrong presented testimony indicating that he has behaved and will behave well in incarceration. We do not regard this as a mitigating circumstance, however, "because inmates are expected to behave well in prison." *Id*. at 284 ¶ 62, 183 P.3d at 535.

### 5. Impact on family

¶81     Armstrong's mother testified that a death sentence would have a negative impact on Armstrong's young children. Although this is a mitigating circumstance, we give it little weight. *Andriano*, 215 Ariz. at 512 ¶ 77, 161 P.3d at 555.

### C. Propriety of death sentence

¶82     "In reviewing the propriety of the death sentence, 'we consider the quality and the strength, not simply the number, of aggravating and mitigating factors.'" *State v. Velazquez*, 216

Ariz. 300, 315 ¶ 75, 166 P.3d 91, 106 (2007) (quoting *Glassel*, 211 Ariz. at 55 ¶ 93, 116 P.3d at 1215).

**¶83** We give the multiple murders aggravating circumstance "extraordinary weight." *State v. Hampton*, 213 Ariz. 167, 185 ¶ 90, 140 P.3d 950, 968 (2006). The mitigating evidence was not sufficiently substantial to warrant leniency.

## CONCLUSION

**¶84** For the foregoing reasons we affirm Armstrong's sentences.

_____
W. Scott Bales, Justice

CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
Patricia A. Orozco, Judge[*]

_____

[*] Justice Andrew D. Hurwitz has recused himself from this case. Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Patricia A. Orozco, Judge of the Arizona Court of Appeals, Division One, was designated to sit on this matter.